[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 29, 2007
THOMAS K. KAHN
CLERK

_____

Nos. 05-16509 & 05-17072

_____

D. C. Docket No.
04-02684-CV-AR-M

THERON OLIVER,

Plaintiff-Appellee,

versus

COCA COLA COMPANY,
BROADSPIRE SERVICES, INC.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(August 29, 2007)

Before BIRCH and BLACK, Circuit Judges, and PRESNELL,[*] District Judge.

_____

[*] Honorable Gregory A. Presnell, United States District Judge for the Middle District of
Florida, sitting by designation.

BIRCH, Circuit Judge:

Defendant-appellants The Coca-Cola Company ("Coca-Cola") and

Broadspire Services, Inc. ("Broadspire") appeal the district court's entry of

summary judgment, calculation of damages, and award of attorney's fees and

expenses in favor of Plaintiff-appellee Theron Oliver.[1]  Oliver sought benefits

under Coca-Cola's long term disability plan, and brought suit after Broadspire and

Coca-Cola denied his initial claim and subsequent appeals.  We find that

Broadspire, as a third-party claims administrator, was not the plan administrator,

and accordingly, not a proper defendant.  We also find that Coca-Cola acted

arbitrarily and capriciously in denying Oliver's claim, no genuine issue of material

fact remains for trial, and the district court therefore properly entered summary

judgment in favor of Oliver.  We affirm the district court's award of damages, and

because the district court did not abuse its discretion, we affirm its award of

attorney's fees and expenses in favor of Oliver.

## I. BACKGROUND

A.  The Benefit Plan

At issue in this case is the Long Term Disability Income Plan of the Coca-

Cola Company (the "Plan"), an employee welfare benefit plan within the meaning

---

[1] Broadspire was known as NATLSCO, Inc. during some of the events at issue in this case.  For convenience, however, we refer to it as "Broadspire" throughout our opinion.

of ERISA.   See 29 U.S.C. § 1002(1).  The Plan document designates Coca-Cola as the Plan Administrator.   The Plan document also contains a delegation by Coca-Cola of some of its powers as Plan Administrator to The Coca-Cola Company Long Term Disability Income Plan Committee (the "Committee").   The Plan document delegates to the Committee "primary responsibility for the administration of the Plan, and all powers necessary to enable it to properly perform its duties," including "the discretionary authority to determine the eligibility of Participants to receive benefits and the amount of benefits to which any Participant may be entitled under the Plan."  R1-24, Exh. 1 §§ 7.2(b), (b)(3). The Plan also provides that the Committee "may delegate to the Administrative Services Provider" its discretionary authority to decide claims.  Id. § 7.2(b)(3). Broadspire is the Administrative Services Provider.

Under the Plan, a claim for benefits involves an initial application, and, if the claimant is unsatisfied with the result of the initial application, two levels of appeals.  Pursuant to § 7.2(b)(3) of the Plan, the Committee delegated to Broadspire responsibility for making initial determinations of claims for benefits under the Plan, as well as responsibility for resolving first-level appeals.   The Committee is responsible for deciding second-level appeals, although in 1995 the

3

Committee delegated to two Coca-Cola employees (the "Delegates") its function of reviewing final claims.

Under the Plan, a participant who suffers a "Disability," as that term is defined in the Plan, "will receive" benefits. R1-24, Exh. 1 § 4.1. The term "Disability" has two definitions under the Plan, one which applies during the first 24 months following the date the disability is incurred, and one which applies after the first 24 months. During the first 24 months, a Disability is defined as "a physical or mental illness or injury [that] continuously disables [the participant] from performing his normal duties for his Employer." Id. § 1.11. This is known as the "own occupation" standard. After the first 24 months, the Plan defines a Disability as "a physical or mental illness or injury [that] continuously disables [the participant] from engaging in any occupation for wage or profit, for which he is reasonably qualified by training, education or experience." Id. This definition is known as the "any occupation" standard.

B. Oliver's Claim

Oliver is a former Systems Support Specialist II at Coca-Cola, and a participant in the Plan. The responsibilities of a Systems Support Specialist II involve providing administrative and technical support for Coca-Cola's voice mail system. Most of Oliver's work was performed at a personal computer, although

he was sometimes required to "[w]alk to telephone switch rooms to do system backups" and provide voice mail training to groups and individuals. R2-56, Exh. 3.

In October 1999, Oliver was involved in an automobile accident. Shortly after the accident, he began to complain of pain, "stiff[ness] and ach[es] in his neck and upper back," and severe headaches. R1-24, Exh. 11 at CCCID0192. Oliver applied for and received 26 weeks of short term disability benefits from Coca-Cola under a separate benefit program that is not part of an ERISA-governed plan. In April 2000, after the short term disability benefits terminated, Oliver timely applied for long term disability ("LTD") benefits under the Plan. Because Oliver's application was filed during the first 24 months following the date of his automobile accident, the "own occupation" standard applied.

In support of his claim for LTD benefits, Oliver submitted statements from two attending physicians, and one physician who had examined Oliver but did not consider herself an "attending physician" and declined to complete Broadspire's evaluation form regarding Oliver's prognosis and limitations. One of Oliver's attending physicians, Dr. Scott Arrowsmith, indicated that Oliver suffered "fibromyalgia of neck/shoulders (post-traumatic)." Id. at CCCID0040. On the line on Broadspire's form labeled "Objective Findings," Dr. Arrowsmith wrote:

5

"[p]ositive EMG for chronic [illegible] radiculopathy and cervical [illegible]; unremarkable cervical MRI."[2] Id. In response to a question asking him to list activities Oliver should not do, Dr. Arrowsmith wrote: "[d]oes not tolerate cervical motion or prolonged sitting - limited tolerance to driving." Id. at CCCID0041. The form then asked Dr. Arrowsmith to list "activities your patient cannot do." Id. Dr. Arrowsmith wrote: "cannot lift over 10 [pounds], cannot sit for over 1 hour." Id. Under a section of the form asking the doctor to indicate level of impairment, Dr. Arrowsmith checked a box labeled "marked limitation of functional capacity/capable of sedentary work," but drew a question mark next to the check box. Id. Dr. Arrowsmith then completed a section of the form labled "Estimated Physical Abilities," and indicated that Oliver could sit for no more than three hours per day, "in short episodes," could stand no more than four hours per day, and could walk no more than three hours per day. Id. at CCCID0042. In response to the question, "[c]an patient now work?," Dr. Arrowsmith responded: "[n]ot when last seen on 1-3-00." Id. at CCCID0043.

---

[2] Radiculopathy is a "[d]isorder of the spinal nerve roots." STEDMAN'S MED. DICTIONARY 1503 (27th ed. 2000). An electromyogram ("EMG") is a test that "evaluates neuromuscular function by monitoring the effect that the nerve impulse has on its associated muscle," and "entails placing needle electrodes in the muscles to detect the nerve impulses transmitted to them when the patient voluntarily uses the muscles or is at rest." 2 ATTORNEYS MED. ADVISOR § 20:21 (2007). Magnetic resonance imaging ("MRI") is a "specialty imaging technique" in which magnetic fields are used to create images of the soft tissue of the human body. Id. § 17:62.

Oliver's other attending physician, Dr. James Fugedy, diagnosed Oliver with "[c]hronic pain syndrome, headaches secondary to neck injury; insomnia." Id. at CCCID0044. On the form provided by Broadspire, Dr. Fugedy also wrote: "the patient continues to have serious head-aches, neck pain and right arm pain requiring narcotic analgesics and developing tolerance. Cannot function due to pain." Id. at CCCID 0045. Dr. Fugedy also wrote: "Mr. Oliver is incapacitated due to continuous headaches, neck pain and right arm pain, which no longer responds to medications." Id. Under the section of the form labeled "Estimated Physical Abilities," Dr. Fugedy indicated that Oliver could "[n]ever" lift, carry, "bend/stoop," squat, crawl, climb, or "[r]each above shoulder level." Id. He further indicated that Oliver could not crouch, kneel, balance, "[p]ush/[p]ull," or "[d]rive automobile." Id. Nor, according to Dr. Fugedy, could Oliver "use [his right] hand[] for repetitive actions such as . . . [s]imple [g]rasping[,] [p]ushing & [p]ulling[,] [or] [f]ine [m]anipulating," or use his right hand and neck in the "[s]tatic [p]osition," for frequent flexing, or for frequent rotating." Id. In response to the question, "Can patient now work?," Dr. Fugedy wrote: "No." Id. at CCCID0046.

On 15 June 2000, Dr. Norman Moskowitz conducted a peer review, on behalf of Broadspire, of the evaluation forms submitted by Oliver's attending

7

physicians.  Dr. Moskowitz did not examine Oliver.  Dr. Moskowitz concluded, in relevant part:

> [T]here is no objective evidence to determine any kind of disability in this person's own specialty and job description.  There is no evidence that a prolonged limited disability is documented.  There are arbitrary checkpoints by a physician without any concrete objective evidence of any physical capacity limitations.  There are no medicals to support any disability at this time.  This is a medical certainty.

Id. at CCCID0039.  On 19 June 2000, Broadspire sent Oliver a letter denying his claim.   After receiving Broadspire's denial of his claim, Oliver filed a written appeal with Broadspire.

On 7 July 2000, Oliver began visiting Dr. Husham Mishu, a neurologist.  Dr. Mishu examined Oliver, performed an EMG and a nerve conduction test, prescribed Oxycontin and Celebrex, ordered "an epidural injection with nerve root sleeve injection," and recommended that Oliver "strongly consider long term disability."[3]  R3-59, Exh. 15 at TOL000106-107.  According to Dr. Mishu, Oliver's EMG "revealed a C5 active and chronic radiculopathy on the right."  Id. at

---

[3] A nerve conduction test is a clinical test often performed in conjunction with an EMG. While an "EMG evaluates neuromuscular function by monitoring the effect that the nerve impulse has on its associated muscle, [] nerve conduction tests focus directly on the nerve, measuring how long it takes to transmit an impulse."  2 ATTORNEYS MED. ADVISOR § 20:21 (2007).

TOL000106. Dr. Mishu also examined the results of Oliver's earlier MRI, and found that it "showed ligamentum flavum hypertrophy and a C5 disk."[4] Id.

On 7 August 2000, Dr. Mishu treated Oliver with injections of Lidocaine and Celestone near his nerve roots in his spine. Dr. Mishu examined Oliver again on 10 August 2000. He noted that Oliver had been taking 40 milligrams of Oxycontin twice daily, with an additional 20 milligrams at night, and that Oliver "said that this has practically 'saved his life.'" Id. at TOL000118. Dr. Mishu stated that he had treated Oliver with an "epidural/nerve root injection," as well as a Botox injection, which seemed to help, but that Oliver "still ha[d] a significant problem with his shoulder and spasms of his neck, shoulder, and posterior trunk muscles." Id.

On 22 August 2000, Oliver visited Dr. Mishu again, and Dr. Mishu wrote that while he believed Oliver was "feeling better overall," he still had a "significant amount of breakthrough pain," and that he believed Oliver needed physical therapy and further Botox injections in his spine. Id. at TOL000115. Dr. Mishu also noted that "[Oliver's] physical examination today is essentially unchanged," and that he continued to have the same problems with his right arm and cervical spine. Id. He

_____

[4] The ligamentum flava are "paired ligaments of yellow elastic fibrous tissue, which bind together the laminae of adjoining vertebrae." STEDMAN'S MED. DICTIONARY (27th ed. 2000). Hypertrophy is a "[g]eneral increase in bulk of a part or organ, not due to tumor formation." Id.

observed that "[Oliver] is able to get around more, do some cleaning up at home, etc., but once he starts to do these things, he then has more pain and has to go lie down." Id. Dr. Mishu increased Oliver's Oxycontin prescription from 40 milligrams twice daily to 80 milligrams twice daily. Id.

In support of his appeal of the initial denial of his LTD benefits claim, Oliver submitted the medical records from his treatment by Dr. Mishu, including Dr. Mishu's notes and the results of the EMG and nerve conduction tests conducted by Dr. Mishu. Broadspire submitted Oliver's file to Dr. Gerald Goldberg for a peer review. Dr. Goldberg did not examine Oliver. Dr. Goldberg began his report, dated 21 September 2000, by summarizing Oliver's symptoms as "myofascial pain, chronic pain in chest, cervical pain, right shoulder pain and numbness in his right four fingers, pain and palpation of the right triceps . . . EMG examination reveals C5 active and chronic radiculopathy on the right and MRI showed ligamentum flavum hypertrophy and C5 disk." R1-24, Exh. 11 at CCCID0084. Dr. Goldberg summarized the results of Dr. Mishu's treatment of Oliver, and noted Dr. Mishu's conclusion that the EMG test "showed a right C5 active and chronic radiculopathy." Id. at CCCID0085. Dr. Goldberg also noted Dr. Mishu's observation that "even [] very minimal activity" . . . "seemed to aggravate [Oliver's] pain." Id. Dr. Goldberg stated that Dr. Arrowsmith's report

10

"rated the patient as having a class 4 restriction, indicating he could do sedentary work"; however, Dr. Goldberg omitted from his report the fact that Dr. Arrowsmith annotated the check box for "class 4 restriction" with a question mark. Id.

Dr. Goldberg concluded his peer review by stating his belief that Oliver could perform his job, based on documents that indicated Oliver's job was "mostly done with the patient sitting and using the computer." Id. He further stated that Oliver's history was "far from typical," and that his reports of pain were "not particularly in a C5 radicular distribution." Id. at CCCID0086. He characterized Oliver's prescription of 40 milligrams of Oxycontin twice daily as "fairly strong narcotic doses," but concluded that the Oxycontin "would certainly make him much more functional." Id. Dr. Goldberg stated that the EMG test did not support "any C7-8 radicular disturbance," but did not dispute Dr. Mishu's conclusion that the EMG showed a C5 chronic radiculopathy. Id. Dr. Goldberg concluded "[t]he two Attending Physician's Statements that were obtained do not list any objective findings," and that therefore he could not "support the long term disability claim from a neurological standpoint." Id.

Shortly after conducting his first peer review, Dr. Goldberg conducted a follow-up review in response to information that Oliver's dosage of Oxycontin had

11

been increased from 40 milligrams twice daily to 80 milligrams twice daily. Dr. Goldberg stated that the high dosage would not present a problem. He opined: "[i]f anything, the medicine helps the pain quite a bit and in the patient's own words 'it saved my life.' Since the medicine helps so much, this lends further support to the fact that he is capable of carrying out his job." Id. at CCCID0089.

Via a letter dated 16 October 2000, Broadspire informed Oliver that it had denied his first-level appeal. The letter stated that Broadspire had conducted a peer review of Oliver's file in an effort "to afford [Oliver] every consideration under the Plan." R1-15, Exh. 7 at CCCID0090. The letter contained a summary of Dr. Goldberg's peer review, and concluded by stating that "the medical documentation within your file does not support your claim that you are totally disabled from your own occupation," and that "[i]n order for us to reconsider your claim for LTD benefits, you must submit objective medical evidence . . . ." Id.

On 17 November 2000, Oliver visited Dr. Kenneth Lazarus. Dr. Lazarus conducted a physical examination and found, in relevant part:

> Examination of the neck reveals it to be exquisitely tender bilaterally. The patient has significant spasm noted in the cervical paraspinal regions bilaterally. He has pain in scalene muscles bilaterally and has exquisite spasm. He has bilateral trapezius trigger points noted on exam. He has pain with lateral bending and with forward bending, and has markedly limited range of motion. He has normal mobility of the shoulders, although elevating the right arm of the shoulder seems to trigger a lot of neck and shoulder pain. Any sort of movement in

12

> the neck appears to trigger some arm discomfort. He reports arm discomfort radiating from the axilla through the medial arm and into the hand. Elbows and wrists function normally. No Tinel or Phalen signs are noted. Hand temperature is symmetrical. Distal pulses are intact. The lower back is nontender. He tolerates straight leg raising well. Distal pulses are intact in the lower extremity.

R3-60, Exh. 24 at TOL000172. Dr. Lazarus described his impressions as "(1) Cervical myofascial pain syndrome. (2) Pseudo-radiculopathy secondary to #1 above. (3) Rule out cervical disc herniation, not demonstrated on the patient's imaging." Id. at TOL000173.

Further, on 27 November 2000, Dr. Mishu completed a questionnaire submitted to him by Oliver's attorneys. Dr. Mishu indicated that Oliver suffered "[c]ervical [r]adiculopathy with muscle spasms," with symptoms including "severe pain in c. spine radiating down his [a]rm (R) and center of back w/ [a]ssociated muscle spasms." R3-60, Exh. 23 at TOL000175. He responded affirmatively to questions asking whether "the limitations associated with the symptoms of [Oliver's] condition and/or side effects from his medications prevent him from performing material and substantial duties of his past work as a Systems Support Specialist eight hours a day, forty hours a week[;] . . . cause lack of concentration, fatigue, drowsiness or other symptoms inhibiting his ability to mentally complete the most sedentary or basic work tasks[;] . . . [and] cause substantial impairment to his ability to concentrate and/or focus on tasks." Id. at TOL000176. He also

13

indicated that Oliver would be required to lay down periodically throughout the day, and that "his reliability in most job settings [would] be poor." Id.

On 13 December 2000, Oliver, through his attorney, filed a second-level appeal of the denial of his claim. In support of his appeal, he included Dr. Lazarus's report and the additional information from Dr. Mishu. In a letter dated 15 December 2000, Broadspire acknowledged receipt of the appeal, but again requested "objective" evidence, "such as current diagnostic test results and **medical records**." R3-60, Exh. 25 (emphasis in original). Broadspire's letter did not mention the MRI, EMG, and nerve conduction tests already submitted by Oliver. See id.

In response to the 15 December 2000 letter from Broadspire, Oliver submitted additional materials related to his LTD benefits claim, including a report signed by Dr. M.R. Mani of the Atlanta Pain Center. Dr. Mani observed that "Mr. Oliver's reproductions on the pain drawing were concise and matched his complaints of pain. They did not appear to be histrionic or exaggerated." R3-61, Exh. 28 at TOL001206. His report concluded that Oliver suffered "[a]djustment disorder with physical complaints and mixed mood," as well as "upper torso, extremity and cervical pain; migraine headache." Id. at TOL001207.

After receiving this additional information from Oliver, Broadspire again had Dr. Goldberg conduct a peer review.   In pertinent part, Dr. Goldberg concluded:

> [T]he patient has complaints of severe neck pain without a true organic etiology being determined.  An MRI scan of the thoracic spine is reported as normal and except for perhaps a disc bulge in the cervical spine, there is no evidence of major disc herniation. Basically, we have the patient's own subjective complaints of his particular pain and level of activity without any objective data to support this.  Based on the above, the determination is made that the patient is not disabled from carrying out the duties of his job which is a sedentary position.

R3-60, Exh. 26 at TOL000730.  Dr. Goldberg did not examine Oliver as part of this peer review.

Another Broadspire physician, Dr. Barry Glassman, submitted an evaluation form dated 16 April 2001 regarding Oliver's claim for LTD benefits.   Like Drs. Moskowitz and Goldberg, Dr. Glassman did not examine Oliver.  Dr. Glassman wrote that he had reviewed Dr. Mani's report concluding Oliver suffered from certain psychological disorders, and that it was his opinion that the pyschological disorders at issue did not render Oliver disabled.  Id.  Dr. Glassman did not consider whether Oliver was physically disabled; rather, his report was limited solely to psychological issues.

15

On 30 April 2001, Coca-Cola, through the Committee, denied Oliver's second-level appeal. The letter contained an itemized list of the materials reviewed by the Committee, but did not include the two EMG tests and the nerve conduction test submitted by Oliver, which supported the diagnosis of cervical radiculopathy. The letter from the Committee repeated Broadspire's frequent objection that Oliver had failed to submit "objective evidence" of his disability, and stated that "a true organic etiology" had not been determined for Oliver's "severe neck pain." R3-61, Exh. 30 at TOL001223. The letter concluded with the statement that "there is no objective evidence to support Mr. Oliver's subjective complaints. . . . Although Mr. Oliver may still require treatment for pain management, the existing medical documentation does not support his claim that he has a Disability, as defined in the Company LTD Plan." Id. at TOL001224.

C. District Court Proceedings

In August 2004, Oliver sued Coca-Cola and Broadspire in the Circuit Court of Etowah County, Alabama, seeking LTD benefits under the Plan. Coca-Cola and Broadspire timely removed the action to the United States District Court for the Northern District of Alabama. After a period of discovery, each party moved for summary judgment. On 21 October 2005, the district court issued an order

16

denying Coca-Cola's and Broadspire's motions for summary judgment, and granting Oliver's.

The court found that Broadspire was the de facto plan administrator, and was not endowed with discretion to interpret the Plan. Because the court found that Broadspire was the true final decision maker, it reviewed Broadspire's determination rather than that of the Committee, and, because it found that Broadspire did not have discretion under the Plan, the court exercised de novo review. Examining the evidence de novo, the court found that Broadspire erred in finding that Oliver was not continuously disabled from performing his own occupation during the first 24 months after his automobile accident, and in finding that he was not continuously disabled from engaging in any occupation after that 24 month period. The court observed:

> [T]he medical opinion evidence is substantial, if not overwhelming, that Oliver . . . is a person of not unlimited skill and education who was told by his own doctor not to return to work and who has been found by his treating neurologist to be totally disabled. He is in constant pain.

Oliver v. The Coca-Cola Co., 397 F. Supp. 2d 1318, 1325 (N.D. Ala. 2005). The court then summarized the conclusions of Dr. Mishu, one of the treating physicians who diagnosed Oliver with cervical radiculopathy, and stated:

> No one has suggested that Dr. Mishu is a complete charlatan or a fool when he recognizes pain and its side effects. . . . If Dr. Mishu was

17

lacking in 'objectivity', so were Drs. Bell-Wade, Arrowsmith, Lazarus, and other medical professionals, all of whom confirmed Dr. Mishu's disability diagnosis and prognosis.

Id. at 1326. The court proceeded to enter judgment in favor of Oliver as to liability, finding that he was disabled under both the "own occupation" and "any occupation" standards. The court deferred a ruling on the issue of damages.

On 10 November 2005, the court ruled on damages. Under the Plan, benefits are based on a participant's "average [monthly] compensation." R5-100 at 1. The court accepted Coca-Cola's contention that Oliver's average compensation was $4,081.46. Relying on § 4.1 of the Plan, which states, "[t]he Participant who incurs a Disability will receive a monthly benefit in an amount equal to 60 percent of his Average Compensation," the court awarded Oliver a monthly disability payment of $2,448.88, or 60 percent of $4,081.46. The court rejected Coca-Cola's argument that Oliver's benefits should be reduced by deducting his Social Security benefits from an amount equal to 70 percent of his average compensation, holding that § 4.2(a) of the Plan barred Coca-Cola from reducing Oliver's benefits below 60 percent of his average compensation. See R1-24, Exh. 1 § 4.2(a) ("[T]he offset for other disability benefits will not serve to reduce the Disability Benefit under this Plan to an amount less than 60 percent of the Participant's Average Compensation as limited.").

18

In addition to ordering Coca-Cola to pay future benefits to Oliver, the court awarded Oliver unpaid disability benefits and interest totaling $208,649.68. Finally, on 12 December 2005, the court entered an order awarding Oliver his attorney's fees and expenses. Coca-Cola and Broadspire now appeal the district court's judgment, both on the merits and as to damages.

## II. DISCUSSION

A. <u>Our Standard of Review</u>

We review <u>de</u> <u>novo</u> a district court's ruling on a motion for summary judgment, "applying the same legal standards that governed the district court's disposition." <u>Williams v. Bellsouth Telecomms., Inc.</u>, 373 F.3d 1132, 1134 (11th Cir. 2004) (citation omitted). Summary judgment is appropriate when, "viewing all facts and reasonable inferences in the light most favorable to the nonmoving party," . . . "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." <u>Kinnon v. Arcoub, Gopman & Assocs., Inc.</u>, 490 F.3d 886, 890 (11th Cir. 2007) (alteration, quotations, and citations omitted); Fed. R. Civ. P. 56(c).

B. <u>The District Court's Standard of Review</u>

A district court is to apply <u>de</u> <u>novo</u> review to an ERISA plan administrator's decision to deny benefits, "unless the benefit plan gives the administrator . . .

19

discretionary authority to determine eligibility or to construe the terms of the plan." Hunt v. Hawthorne Assoc., Inc., 119 F.3d 888, 912 (11th Cir. 1997) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989)). Where, however, the plan administrator has such discretionary authority, an arbitrary and capricious standard of review is appropriate. Id. "To trigger [the arbitrary and capricious] standard of review, the language conferring discretion on the administrator must be express language unambiguous in its design." Id. (internal quotation omitted).

Here, §§ 7.2(b)(2) and (3) of the Plan "express[ly]" and "unambiguous[ly]" granted discretion to the Committee -- to which Coca-Cola delegated authority to determine final appeals -- to interpret the Plan and to determine eligibility of Plan participants to receive benefits. See id. The Plan, however, did not confer such discretion on Broadspire, the company that Coca-Cola hired to administer initial claims and first-level appeals. Accordingly, the appropriate standard of review turns on whether Coca-Cola -- acting through the Committee -- or Broadspire was the plan administrator. The district court found that Broadspire was the true plan administrator, and consequently applied de novo review, correctly observing that the Plan does not confer discretion upon Broadspire. As explained subsequently, however, we find that Coca-Cola was the plan administrator, that the appropriate

20

standard of review was arbitrary and capricious, and that the district court erred in holding otherwise.

C. <u>Whether Broadspire or Coca-Cola was the Plan Administrator</u>

The plan document designates Coca-Cola the plan administrator. Oliver relies on <u>Hamilton v. Allen-Bradley Co.</u>, in which we held that the plan document is not dispositive with respect to the identity of the plan administrator, and that it is necessary to examine "the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document." 244 F.3d 819, 824 (11th Cir. 2001). In <u>Hamilton</u>, a plan participant sued her employer, Allen, arguing that she had been wrongly denied disability benefits under the applicable ERISA plan. 244 F.3d at 822-23. Under that plan, Allen was not designated as the plan administrator; rather, an insurance company, UNAM, was the named plan administrator. <u>Id.</u> The district court granted summary judgment in favor of the employer, Allen, on the ground that it was not the plan administrator, and on appeal, we reversed. We held that "[t]he key question" was "whether Allen had sufficient decisional control over the claim process that would qualify it as a plan administrator . . . ." <u>Id.</u> at 824.

In holding that Allen did have the requisite level of control to qualify as a plan administrator, we relied on several facts. First, we noted that, although

UNAM was the designated plan administrator, "Allen require[d] its employees to go through its human resources department in order to obtain an application for disability benefits." Id. We held that that fact "place[d] Allen in sufficient control over the process to qualify as the plan administrator notwithstanding the language of the plan booklet." Id. Moreover, we observed that Allen held itself out to employees as "administer[ing] the Plan, [] process[ing] all claims and appeals, and [] provid[ing] other administrative services." Id. This bolstered our determination that Allen was a de facto plan administrator. Finally, we noted that "Allen did carry out its administrative designation by handing out the claim forms itself . . . and by fielding questions about the plan from employees." Id. We found that these facts comprised "sufficient indicators that point[ed] to Allen as a plan administrator." Id. We also expressly rejected the approach taken by the Second Circuit in Crocco v. Xerox Corp., 137 F.3d 105, 107 (2d Cir. 1998), which held that only an entity named in the plan document as an administrator could be a plan administrator. See Hamilton, 244 F.3d at 824.

We have also recognized the de facto administrator doctrine in several cases in addition to Hamilton. In Rosen v. TRW, Inc., we reversed the dismissal, for failure to state a claim, of a complaint against an employer not named in the plan document as an administrator, and permitted the plaintiff to pursue "the claim that

22

the company was the de facto plan administrator and the committee was an inactive entity." 979 F.2d 191, 193-94 (11th Cir. 1992). We held that "if a company is administrating the plan, then it can be held liable for ERISA violations, regardless of the provisions of the plan document." Id. Similarly, in Garren v. John Hancock Mutual Life Insurance Co., we stated that "[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan." 114 F.3d 186, 187 (11th Cir. 1997) (per curiam).

Each of the foregoing cases, however, is distinguishable from the instant case in a significant respect: Hamilton, Garren, and Rosen applied the de facto administrator doctrine to employers, not to third-party administrative services providers. At issue in those cases were plans with frameworks similar to that in this case: an employer established an ERISA plan and then outsourced responsibility for administering claims to a separate entity. See Hamilton, 244 F.3d at 822-23; Garren, 114 F.3d at 187; Rosen, 979 F.2d at 192-93. In Hamilton and Rosen, plan participants brought suit against employers that had sought to avoid liability as plan administrators, not, as here, against the third-party claims administrator. Hamilton, 244 F.3d at 822-23; Rosen, 979 F.2d at 192-93. In Garren, the plaintiff brought suit against the third-party claims administrator, and the court held that the true plan administrator was the employer. 114 F.3d at 187.

23

Indeed, where a plaintiff has sought to hold a third-party administrative services provider liable, rather than the employer, we have rejected the de facto plan administrator doctrine. See Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288 (11th Cir. 1989). In Baker, an employer had established an ERISA disability benefits plan, and contracted with Connecticut General Life Insurance to administer claims, though, as here, the employer "reserved the right to review any and all claim denials." Id. at 290. An employee submitted a claim for benefits under the plan, and Connecticut General denied the claim. Id. Baker was informed of his right to appeal the initial benefits decision, but instead brought suit in state court claiming that Connecticut General improperly denied his claim. Id. The case was removed to federal court, and the district court ruled in favor of Connecticut General, basing its decision in part on the determination that Connecticut General was not an ERISA fiduciary and could not be held liable under ERISA for its handling of Baker's claim. Id.

We affirmed, holding that "[the employer] did no more than 'rent' the claims processing department of Connecticut General to review claims and determine the amount payable 'in accordance with the terms and conditions of the Plan.'" Id. (citing the provisions of the plan). We held that Connecticut General "[did] not become an ERISA 'fiduciary' simply by performing administrative functions and

24

claims processing within a framework of rules established by an employer," particularly in light of the fact that the employer made the final determination as to eligibility. Id. (citations omitted).

Were we to find Broadspire a de facto plan administrator on these facts, we would undercut the ability of employers to contract out the administrative tasks associated with operating an ERISA plan, a practice we upheld in Baker. See id. at 290. Indeed, it is hard to imagine how an administrative services provider could fulfill its functions without engaging in the types of activity that, in Hamilton, triggered the application of the de facto administrator doctrine. See Hamilton, 244 F.3d at 824 (finding that employer was de facto administrator because, inter alia, it distributed disability benefit application forms and "field[ed] questions about the plan from employees"). The First Circuit, which also recognizes the de facto administrator doctrine in some contexts, see Law v. Earnst & Young, 956 F.2d 364, 372-73 (1st Cir. 1992), has also declined to apply the de facto administrator doctrine to a third party administrative services provider in circumstances similar to those here. See Terry v. Bayer Corp., 145 F.3d 28, 35 (1st Cir. 1998) ("[W]hen the plan administrator retains discretion to decide disputes, a third party service provider, such as Northwestern, is not a fiduciary of the plan, and thus not amenable to a suit under [ERISA].") (citations omitted). Because Broadspire is

merely an administrative services provider, and because, under the Plan, Coca-Cola, through the Committee -- not Broadspire -- makes the final decision on benefits claims, we are bound by Baker to hold that Coca-Cola is the plan administrator.  See Baker, 893 F.2d at 289-90.  Accordingly, the appropriate standard of review was arbitrary and capricious, see Hunt, 119 F.3d at 912, and the district court erred in applying de novo review.  Moreover, under Baker, Broadspire is not a proper defendant in this action.  893 F.2d at 290.

D.  Whether Coca-Cola's Decision to Deny Oliver's Claim for LTD Benefits was Arbitrary and Capricious

Under the arbitrary and capricious standard of review, the plan administrator's decision to deny benefits must be upheld so long as there is a "reasonable basis" for the decision.  Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989).  The district court's review of the plan administrator's denial of benefits should be limited to "consideration of the material available to [the administrator] at the time it made its decision."  Id.  To determine whether the administrator's denial of benefits was arbitrary and capricious, we begin with the language of the Plan itself.  See 29 U.S.C. § 1104(a)(1)(D) (stating that an ERISA fiduciary shall discharge its duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]").

26

Section 3.1 of the Plan provides:

As a condition to receiving a Disability Benefit, the Disabled Participant must submit a written application on a form provided by his Employer, as soon as practicable after his Disability Date. He must include with his application a medical certification of his Disability.

R1-24, Exh. 1 at CCCID0630.

The relevant portion of Section 3.2(a) provides:

As a condition to receiving a Disability Benefit, the Disabled Participant may be required to submit to a physical and/or mental examination by, and receive a written certification of Disability from, a licensed medical doctor selected or approved by the Administrative Services Provider. The medical doctor's opinion will be binding on the Participant, the Plan and the Administrative Services Provider.

Id. Section 3.2(b) gives the employer the right to make payment of continuing disability benefits contingent on the participant submitting to periodic medical examinations. Id. Section 4.2 of the Plan provides that a disabled plan participant "will receive" disability benefits. Id. at CCCID0634.

Thus, under the terms of the Plan, a disabled participant is entitled to disability benefits. Id. Moreover, to receive those benefits, a disabled participant is required only to submit a "written application on a form provided by his Employer," and provide "medical certification" of his disability. Neither § 3.1 nor any other provision of the Plan requires "objective evidence" of a disability. In addition to the requirement that the participant submit a written application and

27

provide medical certification of a disability, the Plan permits the employer to require the applicant to submit to a medical examination by a doctor of the employer's choosing. Here, however, Coca-Cola chose not to exercise that right. Under the terms of the Plan, then, Oliver was entitled to disability payments so long as he submitted a written application and provided medical certification that he was "disabled" within the meaning of the Plan. Id. at CCCID0630.

In seeking to provide medical certification of his disability, Oliver submitted voluminous medical documentation from at least six treating physicians (Drs. Arrowsmith, Fugedy, Bell-Wade, Mishu, Lazarus, and Mani), including records of physical examinations, treatment notes, and the results of several objective diagnostic laboratory tests including an MRI, two EMGs, and a nerve conduction test that supported his treating physicians' diagnoses. He submitted reports from Drs. Arrowsmith, Fugedy, and Mishu that concluded unequivocally that he could not work. Oliver submitted evaluations from multiple treating physicians reflecting a consistent diagnosis of chronic radiculopathy and pain of the cervical spine and right arm, as well as fibromyalgia and chronic pain syndrome. Oliver also submitted, inter alia, a report from Dr. Mishu that addressed how Oliver's disability related specifically to the various tasks required of him as a Systems Support Specialist, and concluded that he could not perform those tasks.

28

We find that Coca-Cola's denial of Oliver's LTD benefits claim was arbitrary and capricious, for a number of reasons. Coca-Cola based its rejection of Oliver's claim on its contention that Oliver failed to provide "objective evidence" of his disability, stating that the "true organic etiology" of Oliver's pain had not been determined. R3-61, Exh. 30. Yet much medical evidence, especially as it relates to pain, is inherently "subjective" in that it cannot be quantifiably measured. Indeed, the only evidence of a qualifying disability may sometimes be the sort of evidence that Coca-Cola and Broadspire characterize as "subjective," such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms. See, e.g., Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003) ("Pain often and in the case of fibromyalgia cannot be detected by laboratory tests.").

The Plan does not exclude from its coverage pain-related disabilities, such as fibromyalgia or chronic pain syndrome, merely because they are not subject to diagnosis by "objective" laboratory tests. Neither Coca-Cola nor Broadspire identified any evidence that conflicted with Oliver's diagnosis of fibromyalgia and chronic pain syndrome, and their peer review doctors did not dispute those diagnoses. Nonetheless, Coca-Cola's peer reviewer, Dr. Goldberg, recommended denying Oliver's disability claim because, in his view, Oliver's medical evidence

29

consisted of "[his] own subjective complaints of his particular pain and level of activity without any objective data to support this." R1-24, Exh. 11 at CCCID0612 (18 March 2001 peer review by Dr. Goldberg). By denying Oliver's claim on the ground that he had not provided "objective" evidence of his pain, despite Oliver's submission of uncontroverted medical evidence of the only sort available to prove his disability -- including medical reports from multiple physicians stating that his reports of pain were consistent with their diagnoses and "did not appear to be histrionic or exaggerated" -- Coca-Cola engaged in capricious decision making. See Hawkins, 326 F.3d at 919; R3-61, Exh. 28 at TOL001206 (13 April 2000 report by Dr. Mani).

Indeed, it is unclear what additional "objective" evidence of his pain Oliver could have provided in addition to, among other things, the medical opinions of numerous treating physicians based on examinations of Oliver, two positive EMGs, a nerve conduction test, and an MRI. Tellingly, Coca-Cola never identified what sort of "objective" evidence it sought. "Although in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering, we conclude that it was arbitrary and capricious to require such evidence in the context of this

30

Plan and [Oliver's diagnosis]."[5] See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 442-43 (3d Cir. 1997); see also Hawkins, 326 F.3d at 919 ("[T]he gravest problem with [the peer review doctor's] report is the weight he places on the difference between subjective and objective evidence of pain.").

Coca-Cola's denial of Oliver's claim for failure to provide objective evidence of his disability was also arbitrary and capricious because it was based on a mischaracterization of the evidence Oliver submitted. As noted previously, two of Oliver's treating physicians conducted EMG tests, the results of which supported Oliver's diagnosis of chronic radiculopathy. See R1-24, Exh. 11 at CCCID0040 (12 May 2000 evaluation by Dr. Arrowsmith) (citing "Positive EMG for chronic [] radiculopathy"); R3-59, Exh. 15 at TOL000106-107 (7 July 2000 report of Dr. Mishu) ("We did perform nerve conduction/EMG examination today which revealed a C5 active and chronic radiculopathy of the right arm with myofacial pain, muscle tension and overall nerve root irritation."). These tests provided the clinical, objective evidence that Broadspire and Coca-Cola requested throughout the claims process. See, e.g., Black v. Food Lion, Inc., 171 F.3d 308,

---

[5] On appeal, Coca-Cola argues that the district court "failed to appreciate a fine, but important, distinction: the Committee required Oliver to submit objective medical evidence of his claimed inability to perform his job, not of the etiology of his pain." Appellant's Br. at 34. Yet the record before us belies this assertion. See R1-15, Exh. 26 at CCCID0009 (letter from the Committee to Oliver denying Oliver's final appeal) (noting that "Mr. Oliver has expressed subjective complaints of severe neck pain" but that "a true organic etiology" of the pain had not been determined).

31

309 (5th Cir. 1999) (characterizing MRIs and EMGs as "objective tests"). While

Dr. Goldberg noted that the EMG conducted by Dr. Mishu only tested certain

muscles, he did not assert that the results of the test were invalid,[6] and neither he

nor Dr. Moskowitz addressed the results of the EMG discussed in Dr.

Arrowsmith's evaluation. See R1-24, Exh. 11 at CCCID0085-86 (21 September

2000 peer review by Dr. Goldberg); id. at CCCID0039 (15 June 2000 peer review

by Dr. Moskowitz). Though he did not dispute the validity of the one EMG test he

acknowledged, Dr. Goldberg nonetheless ignored the results of both EMGs when

he later concluded that Oliver had failed to provide "any objective findings" in

support of his disability claim, an incorrect statement and a mischaracterization of

the evidence presented by Oliver. See id. at CCCID0086; see also id. at

CCCID0612 (18 March 2001 peer review by Dr. Goldberg) (noting lack of "any

objective data" to support Oliver's disability claim).

Indeed, the record reveals a disturbing pattern of Dr. Goldberg disregarding

evidence that would undermine his ultimate conclusion. For example, Dr.

Goldberg placed great emphasis on Dr. Arrowsmith's ambiguous demarcation of a

check box next to the phrase "[m]arked limitation of functional capacity/capable of

---

[6] Dr. Goldberg noted only that the EMG "could" be consistent with another condition with which Oliver was not diagnosed. R1-24, Exh. 11 at CCCID0086. Dr. Goldberg identified no evidence that Oliver in fact suffered from the alternative condition, nor did he indicate that he believed Oliver suffered from that condition, and not chronic radiculopathy. See id.

32

sedentary work," which Dr. Arrowsmith qualified by placing a question mark next to the check box.  Id. at CCCID0085 (21 September 2000 peer review by Dr. Goldberg); id. at CCCID0040-43 (12 May 2000 evaluation by Dr. Arrowsmith). Yet Dr. Goldberg flatly ignored the remainder of the same evaluation form, in which Dr. Arrowsmith clarified any ambiguity by explicitly stating his opinion that Oliver was not capable of working.  Id. at CCCID0043.

Similarly, a common refrain in Dr. Goldberg's peer reviews was that Oliver's job was "sedentary," and that therefore he was capable of performing his job functions.  See, e.g., id. at CCCID0086 (21 September 2000 peer review by Dr. Goldberg); id. at CCCID0612 (18 March 2001 peer review by Dr. Goldberg).  Yet Dr. Goldberg never addressed Dr. Arrowsmith's findings that Oliver was capable of sitting for only one hour at a time, or three hours per day total with periodic breaks.  See id., CCCID0041-42.  If Oliver could not sit for more than an hour at a time, that fact would undermine a finding that he could perform his job, which required him to sit for five hours a day, five days a week.   Yet rather than address that finding in his peer review, or dispute it as unsound, Dr. Goldberg failed to mention Dr. Arrowsmith's finding that Oliver could not sit for prolonged periods of time, and proceeded to cite the sedentary nature of Oliver's position as a reason to deny Oliver's disability claim.   Likewise, Dr. Goldberg did not acknowledge

reports from at least two of Oliver's treating physicians stating that Oliver either could not drive a car or that he had a limited ability to do so, and failed entirely to address Dr. Mishu's 27 November 2000 evaluation that addressed in detail Oliver's inability to perform his specific job functions, due not only to his chronic radiculopathy, but also to the effects of his pain and the side effects of his medication.

Similarly, the limited "peer review" performed by Dr. Glassman, a psychiatrist, did not provide a basis on which to deny Oliver's LTD benefits claim. Dr. Glassman did not consider any medical evidence relating to the disabilities at issue, but rather addressed only psychological issues. He concluded that Oliver was not disabled due to psychological factors, but did not address whether Oliver was physically disabled.

If the foregoing were not enough to persuade us that Coca-Cola's review of Oliver's claim was arbitrary and capricious, Coca-Cola's denial letter to Oliver confirms that conclusion. Coca-Cola's denial letter to Oliver includes an itemized list of the materials Coca-Cola reviewed in deciding Oliver's claim. Though the list includes the MRI test, which did not provide conclusive support for Oliver's disability claim, conspicuously absent from the list are the two EMG tests and the nerve conduction test that Oliver's physician's relied on as clinical objective

34

evidence of Oliver's chronic radiculopathy, and that Coca-Cola's peer review doctors did not dispute. The letter contains a discussion of some of the medical evidence provided by Oliver, and addresses the MRI, which though itself was inconclusive, did not contradict the results of the EMGs and nerve conduction test. However, the letter simply notes that the MRI did not support a finding of disability, and omits any discussion of the EMGs, nerve conduction test, and other evidence Oliver submitted that supported a finding of disability.[7]

By relying on Dr. Goldberg's flawed peer review as a basis for denying Oliver's LTD benefits claim, and by failing to review relevant medical evidence that supported Oliver's claim, Coca-Cola acted arbitrarily and capriciously. Though courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," plan administrators "may not arbitrarily refuse to credit a

---

[7] The denial letter also displays other questionable characterizations of evidence by Coca-Cola. For example, though Coca-Cola never addressed the issue of side effects caused by Oliver's medication, page two of their denial letter contains a passing reference to the issue, noting that in his report of November 2000, Dr. Lazarus indicated that he "was going to reduce Mr. Oliver's medication." R3-61, Exh. 30. Yet Coca-Cola was aware that in the time since Dr. Lazarus completed that report, Oliver's dosage of Oxycontin had only increased, first from 40 milligrams twice daily to 80 milligrams twice daily, and finally from 80 milligrams twice daily to 160 milligrams twice daily. Indeed, Dr. Goldberg's peer review of 18 March 2001 noted that Oliver was taking "Oxycontin, 160 mg. 2x per day as well as a tricyclic and an antidepressant." R1-24, Exh. 11 at CCCID0611. Coca-Cola's reliance, on 30 April 2001 (the date of the final denial letter), on a physician's statement from November of the prior year that he would attempt to reduce Oliver's dosage, when Coca-Cola's own notes reflected that, in fact, Oliver's dosage had only increased, was at best arbitrary and capricious.

claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003). Here, Oliver presented Broadspire and Coca-Cola with a plethora of medical evidence in support of his disability claim. Coca-Cola denied Oliver's claim not on the basis of conflicting, reliable evidence -- a practice we have upheld, see Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1287 (11th Cir. 2003) -- rather, it simply ignored relevant medical evidence in order to arrive at the conclusion it desired. Coca-Cola does not identify any evidence creating a genuine issue of material fact as to whether it improperly required objective evidence of Oliver's pain, or as to whether it ignored Oliver's objective evidence of chronic radiculopathy. Accordingly, even viewing the evidence in the light most favorable to Coca-Cola, as we must, we are compelled to find that Coca-Cola acted arbitrarily and capriciously in denying Oliver's claim for LTD benefits, and that the district court properly granted summary judgment in favor of Oliver.

E. Exhaustion of Remedies

Because Oliver initiated his claim for LTD benefits during the first 24 months of his disability, the "own occupation" definition of long term disability applied. See R1-24, Exh. 1 §1.11. Neither Broadspire nor Coca-Cola has considered Oliver's claim under the "any occupation" standard, which applies to

36

claims for LTD benefits after the first 24 months following the onset of the disability. See id. Accordingly, we agree with Coca-Cola that Oliver did not exhaust his administrative remedies with respect to his claim for LTD benefits under the "any occupation" definition. See Perrino v. Southern Bell Tel. Co., 209 F.3d 1309, 1315 (11th Cir. 2000) ("[A]s a general rule plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court.").

Though the general rule in our circuit is that ERISA plaintiffs must exhaust administrative remedies before bringing suit, it is also well-established that "[t]he decision of a district court to apply or not apply the exhaustion of administrative remedies requirement for ERISA claims is a highly discretionary decision which we review only for a clear abuse of discretion." Id. (emphasis in original) (citing Springer v. Wal-Mart Assocs.' Group Health Plan, 908 F.2d 897, 899 (11th Cir. 1990)). Excusal of the exhaustion requirement is appropriate "when resort to the administrative remedies would be futile or the remedy inadequate." Counts v. Am. Gen. Life & Accident Ins. Co., 111 F.3d 105, 108 (11th Cir. 1997) (citation omitted).

Here, under the highly deferential standard that applies, we cannot find that the district court "clear[ly] abuse[d] [its] discretion" in excusing Oliver from exhausting his administrative remedies with respect to his claim for LTD benefits

under the "any occupation" standard. See Perrino, 209 F.3d at 1315. Indeed, in an analogous case, the Sixth Circuit reversed as an abuse of discretion a district court's decision to apply the exhaustion of remedies requirement in this context. See Dozier v. Sun Life Assurance Co. of Canada, 466 F.3d 532 (6th Cir. 2006). In Dozier, the plaintiff was a participant in a long term disability plan and a life insurance policy through his employer. Id. at 533. Under the plan, a participant could receive LTD benefits if he satisfied the "own occupation" standard of disability. Id. The life insurance plan offered a waiver-of-premium benefit for participants who satisfied the "any occupation" definition of disability. Id. Dozier applied for LTD benefits, which required that he satisfy the "own occupation" standard, and his claim was denied on the ground that his position was "sedentary." Id. at 534. He brought suit under ERISA in federal district court, seeking both LTD benefits and the premium waiver benefit. Id. The district court dismissed without prejudice his claim for the premium waiver benefit, on the ground that Dozier had not exhausted his administrative remedy with respect to that claim, because he had not sought to show that he was disabled from performing "any occupation." Id.

The Sixth Circuit reversed as abuse of discretion the district court's dismissal of Dozier's premium waiver claim. Id. It found that it would have been

futile for Dozier to exhaust his administrative remedy with respect to his claim for the premium waiver benefit, which required him to prove he was disabled from performing "any occupation," after the plan administrator had already determined he was not disabled from performing his own occupation. Id. at 535. The court observed that "[i]n denying the long-term-disability claim, Sun Life had made a final determination that Dozier was able to perform 'the Material and Substantial Duties of <u>his Own</u> Occupation.' . . . That determination necessarily precluded him from arguing with a straight face to the same insurance company that he was 'unable to perform the material and substantial duties of <u>any</u> occupation . . . .'" Id. (emphasis in original). The Sixth Circuit further found that "an appeal of the waiver-of-premium claim [would not] have advanced any of the purposes of the judicially-created ERISA exhaustion requirement," including, <u>inter alia</u>, promoting the consistent treatment of claims and minimizing unnecessary costs during the claims process. Id. at 536 (citation omitted). Because here, as in <u>Dozier</u>, it would have been futile for Oliver to seek benefits from Broadspire and Coca-Cola under the "any occupation" definition of disability where those same decision makers had already denied benefits under the "own occupation" standard, we find that the district court did not abuse its discretion by deciding not to apply the exhaustion of administrative remedies requirement. See id. at 536; <u>Perrino</u>, 209 F.3d at 1315.

39

F. Damages

Coca-Cola argues that, even if Oliver is awarded LTD benefits under the Plan, § 4.2(a) requires that his benefits be reduced to account for benefits he receives from other sources, such as Social Security. Section 4.2 is entitled "Offset for Other Disability Benefits," and subsection (a) provides:

> Reduction in Disability Benefit. The monthly Disability Benefit payable from this Plan to the Participant who receives disability benefits from any source described in Subsection (b) will be reduced as necessary so that the total of his monthly Disability Benefit from this Plan equals no more than the following amount:
>
> (1) 70 percent of his Average Compensation . . . minus
>
> (2) the amount of his monthly disability benefits payable from all other sources;
>
> provided that . . . the offset for other disability benefits will not serve to reduce the Disability Benefit under this Plan to an amount less than 60 percent of the Participant's Average Compensation . . . .

R1-24, Exh. 1 § 4.2(a).

This section of the Plan is far from a paragon of clarity, and contains seemingly inconsistent provisions. On one hand, § 4.2(a) provides that benefits should be "reduced" so that benefits received under the Plan plus benefits received from other sources total no more than 70 percent of a participant's average compensation. On the other hand, it provides that the offset will not reduce benefits received under the Plan to an amount less than 60 percent of a

40

participant's average compensation. Yet under § 4.1, the standard, non-offset benefit rate is set at 60 percent of average compensation; thus, if the final sentence of § 4.2(a) is read literally as placing a floor of 60 percent on any offset, there could be no reduction in benefits, and the offset provision would be meaningless.

Neither Coca-Cola nor Oliver attempts to explain how these provisions should be reconciled. Each litigant merely quotes the language they favor, while ignoring the remainder of § 4.2(a). Because Coca-Cola is granted discretion to interpret the Plan's provisions, however, its construction of § 4.2 is entitled to limited deference, within the framework we articulated in HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co., 240 F.3d 982, 993-94 (11th Cir. 2001). In HCA Health Services, we set forth a multi-step approach for reviewing a plan administrator's interpretation of a plan provision, where the plan administrator is granted discretion. Id. First, we must determine de novo whether the administrator's interpretation was "wrong." Id. at 993. If so, we then must determine whether "the claimant has proposed a reasonable interpretation of the plan." Id. at 994 (internal quotation omitted). If the administrator's interpretation is wrong, and the claimant's interpretation reasonable, we then decide "whether the [plan] administrator's wrong interpretation is nonetheless reasonable." Id. If it is,

41

"then this wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable." Id.

Under the HCA Health Services analysis, we find that Coca-Cola's interpretation of the Plan is both wrong and unreasonable, and that Oliver's interpretation, while rendering the "offset" provision largely toothless, is nonetheless reasonable, given the text of § 4.2(a). With respect to the first step, we find that Coca-Cola's interpretation is "wrong," in that it ignores the final sentence of § 4.2(a). See id. at 993. That sentence plainly states that "the offset for other disability benefits will not serve to reduce the Disability Benefit under this Plan to an amount less than 60 percent of the Participant's Average Compensation." R1-24, Exh. 1 § 4.2(a). We further find that Oliver's interpretation, which gives effect the full text of § 4.2(a), is a "reasonable" interpretation of a flawed contractual provision. See HCA Health Servs., 240 F.3d at 994. Finally, we find that Coca-Cola's wrong interpretation of § 4.2(a) is not reasonable, as it requires excising from the Plan part of the text of § 4.2(a). See id. Because the construction of § 4.2(a) urged by Coca-Cola is both wrong and unreasonable, while Oliver's proposed interpretation is simply a straightforward reading of § 4.2(a)'s poorly drafted text, we accept Oliver's interpretation, and affirm the district court's

holding that § 4.2(a) prohibits Coca-Cola from reducing Oliver's LTD benefits below 60 percent of his average compensation.

The district court also awarded Oliver interest on his LTD benefits. Coca-Cola does not appeal the award of interest, and the issue is therefore waived. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (stating that an issue not raised on appeal is waived).

G. Attorney's Fees and Expenses

Coca-Cola also appeals the district court's award of attorney's fees and expenses in favor of Oliver under 29 U.S.C. § 1132(g)(1). Coca-Cola essentially urges us to make a de novo determination as to whether attorney's fees and expenses are appropriate in this case, and argues that we should reverse the award because the district court did not find that Coca-Cola acted in bad faith. "Awards of attorney's fees under ERISA," however, "are reviewed for abuse of discretion." Wright v. Hanna Steel Corp., 270 F.3d 1336, 1344 (11th Cir. 2001) (citation omitted). In deciding whether to award attorney's fees, a district court considers:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; (5) and the relative merits of the parties' positions.

43

Id. (alteration and citations omitted). "No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address. In particular types of cases, or in any individual case, however, other considerations may be relevant as well." Id. at 1345 (quotation, alteration, and citation omitted).

In Wright, we upheld a district court's award of attorney's fees to an ERISA plaintiff, despite a finding by the district court that the defendant did not act in bad faith, and where the plaintiff acted solely for his own benefit, not for the benefit of other plan members. See id. at 1344. We held that the district court did not abuse its discretion in awarding attorney's fees because it considered the relevant factors, and based its award in part on the culpable conduct (though not bad faith) of the defendant. Id. at 1345. We find the instant case indistinguishable from Wright. Though the district court did not make a finding that Coca-Cola acted in bad faith, it based its award of attorney's fees in part on the need "to deter fiduciary decision-making of the sort found in this case," R5-117 at 1-2, a clear reference to Coca-Cola's arbitrary and capricious decision making in denying Oliver's claim, and an appropriate basis for an award of attorney's fees under 29 U.S.C. § 1332(g)(1). Accordingly, we cannot find that the district court abused its discretion in awarding attorney's fees and expenses to Oliver.

## III. CONCLUSION

Coca-Cola and Broadspire appeal the district court's grant of summary judgment in favor of Oliver, the court's calculation of damages, and the court's award of attorney's fees and expenses in favor of Oliver. Because Coca-Cola's denial of Oliver's claim for LTD benefits was arbitrary and capricious, and Coca-Cola has identified no genuine issue of material fact for trial, we **AFFIRM** the district court's grant of summary judgment in favor of Oliver against Coca-Cola. Because Broadspire was not a proper defendant, we **REVERSE** the entry of summary judgment against Broadspire, and **REMAND** with instructions to dismiss Oliver's claims against Broadspire. Finally, we **AFFIRM** the district court's award of damages, as well as its award of attorney's fees and expenses in favor of Oliver.

BLACK, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority opinion that the district court erred both by applying a *de novo* standard of review and by granting summary judgment to Oliver against Broadspire. I respectfully dissent from the majority's affirmance of the district court's grant of summary judgment to Oliver against Coca-Cola. I would remand the case for the district court to apply the correct standard of review to Coca-Cola's decision to deny benefits.