[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 27, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-10961

_____

D. C. Docket No. 07-00248-CV-T-24-MAP

SHARON CREEL,

                                                            Plaintiff-Appellant,

versus

WACHOVIA CORPORATION,

                                                            Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 27, 2009)

Before BIRCH and PRYOR, Circuit Judges, and STROM,[*] District Judge.

BIRCH, Circuit Judge:

---

[*] Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

Sharon Creel appeals from the district court's grant of summary judgment in favor of Wachovia Corporation on her suit seeking long-term disability ("LTD") benefits under Wachovia's Long Term Disability Plan ("the Plan"). The district court concluded that Wachovia's decision to terminate Creel's LTD benefits was neither de novo wrong nor unreasonable. After reviewing the record and the arguments of the parties, we VACATE the grant of summary judgment and REMAND for further proceedings in light of this opinion.

## I. BACKGROUND

### A. Wachovia's LTD Plan

The Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.. Wachovia's Benefits Committee is designated as the "Plan Administrator" and is granted sole discretionary authority regarding the interpretation of the terms and provisions of the Plan. The designated third-party Claims Administrator for the Plan, Liberty Life Assurance Company of Boston ("Liberty Mutual"), makes initial decisions regarding eligibility for disability benefits.

To receive LTD benefits under the Plan, claimants must prove that they meet the Plan's definition of "disabled." The Plan describes the requisite "proof" of disability as:

(a) the evidence in support of a claim for benefits in a form or format satisfactory to the Claims Administrator, (b) an attending Physician's statement in a form or format satisfactory to the Claims Administrator, completed and verified by the Participant's attending Physician, and (c) provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays <u>and/or other forms of objective medical evidence that may be required by the Claims Administrator in support of a claim for benefits</u>. Notwithstanding the foregoing, the Plan Administrator, or the Claims Administrator acting as agent of the Plan Administrator, may also consider other evidence of a claimed Disability, including, but not limited to evidence discovered or otherwise developed by the Plan Administrator or the Claims Administrator.

WAC1461[1] (emphasis added). What a claimant must prove to establish disability depends on how long she has received benefits. During the first twenty-four months of coverage, a claimant would be "disabled" if she shows that she had an illness or injury that made her unable to perform all of the regular duties of her then-current job. After twenty-four months, the claimant would be "disabled" only if she established that her condition made her unable to perform all of the duties required for any occupation for which her background and experience would make her qualified. However, if her disability is based on a mental illness, she generally cannot receive more than twenty-four months of LTD benefits.[2] The Plan defines

---

[1] The administrative record in this case was filed as part of Wachovia's motion for summary judgment (R1-14) and Bates numbered from WAC0077 to WAC1529. All references to documents from that record will use the corresponding Bates number.

[2] Claimants are exempt from this rule if they are either in a hospital or confined for treatment for at least fourteen consecutive days after the twenty-four-month period is over.

3

"mental illness" as "mental, nervous, or emotional diseases or disorders of any type." WAC1442.

B. Creel's Benefits Claim

Creel is a fifty-six-year-old former employee of Wachovia. She worked there until 15 July 2002, when she was hospitalized for an attack in which she complained of chest pain and partial paralysis of the left side of her body. Creel subsequently applied for short-term disability ("STD") benefits under Wachovia's STD plan. As part of her application, Creel submitted two attending physician statements ("APS") to Liberty Mutual. One APS, from her primary care physician, Dr. Nancy Sokany, made a primary diagnosis of major depression and a secondary diagnosis of anxiety and migraine headaches. The other APS was from her psychiatrist, Dr. Brian Harrelson, who rendered a primary diagnosis of anxiety and panic disorder. Liberty Mutual approved her application, and she received STD benefits for twenty-six weeks, the maximum period permitted under Wachovia's STD plan.

Creel also submitted a claim for LTD benefits under the Plan, which Liberty Mutual approved in January 2003. Over the ensuing months, Liberty Mutual requested medical records from Creel's then-current physicians to monitor whether she still had a disability under the Plan. The responses it received largely reiterated

4

the diagnoses from the initial APSs. For example, her primary care physician in late 2003, Dr. Jorge Gadea, rendered a primary diagnosis of depression and a secondary diagnosis of migraine headaches.

In January 2005, Liberty Mutual sent a letter to Creel informing her that it was commencing a review process to determine if she met the Plan's post-twenty-four-month definition of disability. The letter noted that Liberty Mutual would terminate her LTD benefits unless it found that she was unable to perform any occupation, rather than just her own.[3] As part of Liberty Mutual's inquiry, it requested that Creel obtain various medical documents from her treating psychiatrist, Dr. Walter Afield, and her treating neurologist, Dr. Denise Griffin. Liberty Mutual also asked Creel to keep a headache diary, a blank copy of which it attached to the letter.[4] Creel completed the headache diary, in which she described experiencing incapacitating migraine headaches on at least eight occasions between 19 January 2005 and 26 February 2005.[5] She submitted the diary to Liberty Mutual along with the other requested documents. Shortly thereafter, Liberty

---

[3] The letter noted that she would continue to receive benefits pending the outcome of the review, even after the twenty-four-month deadline had elapsed.

[4] The diary asks the claimant to document her actions prior to the onset of the headache and to list the amount of time she was "incapacitated" due to each headache. WAC1140.

[5] Some of these migraines lasted more than one day, so she experienced migraines on eleven days during that period.

Mutual sent her entire file to an independent physician consultant ("IPC"), the board-certified neurologist Dr. Patrick Parcells, for review.

Dr. Parcells examined whether Creel's file supported her assertion that her headaches constituted a physical, rather than mental, limitation. He concluded that her medical record supported the conclusion that her headaches were secondary to depression and anxiety and that she was not suffering from migraines. Liberty Mutual specifically asked Dr. Parcells to consider Creel's headache diary, which it characterized as reporting headaches on nine out of thirty days.[6] He found this evidence to be of limited value because of the lack of detail regarding each headache, though he noted that the headaches appeared to result from fluctuations in the weather. Additionally, he could find no information in her file showing that her headaches were incapacitating. According to Dr. Parcells, her file overall indicated that she "ha[d] subjective complaints of frequent headaches that subjectively are incapacitating;" however, there was no "objective information available on laboratory testing or by history that these headaches [were] an organic process." WAC1135. Accordingly, he found that the record supported the

_____

[6] It is unclear how Liberty Mutual reached this total, since there were eight entries and eleven separate incidents over the thirty-nine days covered in the diary, from 19 January 2005 to 26 February 2005, and no particular thirty-day stretch had nine days of headaches. Creel's initial entry, on 19 January 2005, spanned two columns in the diary, so Liberty Mutual possibly thought that this represented two distinct incidents. Dr. Parcells's report describes the correct length and number of reported incidents.

conclusion that Creel's headaches were "not physically incapacitating" and should not "be considered the main cause for any inability to work." Id.

After receiving Dr. Parcells's report, Liberty Mutual sent a letter to Creel notifying her that her benefits were terminated effective 26 April 2005. In taking this action, Liberty Mutual primarily relied on Dr. Parcells's conclusions about the non-physical cause of Creel's problems and her apparent ability to work. It also noted that Creel herself, in her last visit with Dr. Griffin, indicated that her headaches might have been weather-related. Since "the medical information currently on file [did] not support the presence of a physical condition that would prevent [Creel] from performing any occupation" for which she was qualified, Liberty Mutual found her eligible to receive benefits only for the twenty-four months allotted for mental illnesses. WAC1125.

Creel appealed this termination in October 2005. In support of her appeal, she submitted additional medical records from Dr. Afield and Dr. Gadea, which covered the period from February 2004 to September 2005. Creel contended that these records demonstrated that her migraines were of a disabling nature and resulted from a physical, rather than mental, impairment, thereby making the mental illness limitation inapplicable to her claim.[7] She also unsuccessfully sought

---

[7] Though these notes contain multiple references to psychological problems, such as depression, they also repeatedly mention disabling headaches and dementia, both of which were

7

to depose Dr. Parcells as an expert witness. After the district court denied Creel's Petition Pursuant to Federal Rule of Civil Procedure 27 in April 2006, Liberty Mutual gave her until 10 June 2006 to submit all documents she wanted it to consider in the review of her appeal.[8]

Prior to this deadline, Creel provided additional medical records, including various documents from Dr. Afield and a 25 May 2006 report from Dr. Robert Martinez, a neurologist. Dr. Afield's office notes indicated that Creel might be experiencing the early stages of dementia and that she had reported suffering from severe headaches approximately ten days out of every month. He also noted that she was "totally disabled," which was due solely to the rapidly-worsening, purely physical, brain impairment that was causing her dementia. WAC0871, 0873–74. Dr. Afield also examined a number of prior medical reports regarding Creel, which he thought supported his conclusion that she suffered from "some rather substantive cerebral dysfunction." WAC0867. He also found the conclusions in

---

attributable to physical causes.

[8] Rule 27 permits any "person who desires to perpetuate testimony regarding any matter that may be cognizable in any court of the United States [to] file a verified petition in the United States district court in the district of the residence of any expected adverse party." Fed. R. Civ. P. 27(a)(1). Such a motion will be granted "[i]f the court is satisfied that the perpetuation of the testimony may prevent a failure or delay of justice." Fed. R. Civ. P. 27(a)(3).

Dr. Parcells's report to be "totally incorrect" and "wrong" because Dr. Parcells failed to recognize that Creel's impairments had a physical cause.[9] WAC0868–70.

Dr. Martinez's 25 May 2006 report evaluated Creel's claims regarding migraine headaches. He agreed with the diagnosis of atypical migraine syndrome — a determination he found to be supported by Creel's medical records, including the results from a battery of lab tests, her responses to various medications, and her own statements.[10] As a result, he found that Creel's headaches caused her to be incapacitated, and thus unable to work, for ten days a month. Since there was no discernable pattern for the onset of the migraines, he noted that it was impossible to predict when they would occur.

Liberty Mutual submitted Creel's entire file, including these new opinions, to a second IPC, Dr. Leslie Kurt. According to Dr. Kurt, the evidence in her record reflected "excellent comprehension and other cognitive functioning" and indicated that any cognitive problems Creel experienced were episodic and minimal. WAC0853. Dr. Kurt noted that no doctors appear to have observed Creel experiencing a migraine, despite their alleged frequency. Though Creel had "a

---

[9] As Wachovia notes, Dr. Afield's analysis may contain some factual errors, including the apparent assertion that Dr. Parcells relied on office notes that he likely was not shown.

[10] The tests included an echocardiogram, magnetic resonance angiography (MRA), and magnetic resonance imaging (MRI). Dr. Martinez also indicated that doctors tried at least ten different medications to alleviate Creel's problems.

9

documented history of hypertension, hypothyroidism and asthma," Dr. Kurt believed that the records showed that these problems had been stabilized and thus were not contributing to her cognitive difficulties. Id. Accordingly, she characterized Creel's cognitive problems as "most likely secondary to depression and anxiety" and deemed them to be "of insufficient severity" to necessitate any work-related restrictions. Id. In reaching this conclusion, she discounted Dr. Afield's diagnosis of dementia because no other doctors had made such a diagnosis and Dr. Afield had performed no memory tests to confirm his suspicions.[11] Dr. Kurt did find that the record supported a diagnosis of recurrent headaches connected to various muscle spasms. As a psychiatrist, though, she felt unqualified to determine whether Creel was experiencing migraines and thus suggested that the file be reviewed by a neurologist to determine if the claim of medical impairment due to migraines had adequate support.

Based on Dr. Kurt's recommendation, Liberty Mutual had a third IPC, Dr. Choon Rim, examine Creel's file. Dr. Rim, a neurologist, reviewed all of the documents in her record and spoke with Dr. Martinez over the telephone about

---

[11] She also noted that Dr. Afield expressed the opinion that Creel had fibromyalgia and chronic fatigue syndrome. Since there was no way to medically verify either condition, she expressed no opinion on those diagnoses.

Creel.[12]  He thought that her file contained no evidence of a neurological abnormality that could account for her headaches.[13]  He noted that Creel "ha[d] a history of depression, anxiety, panic attacks, and chronic fatigue syndrome" and that "her symptoms appear[ed] to be clinical manifestations being either psychogenic or psychiatric in nature."  WAC0846.  Though migraine headaches normally would render a patient unable to work, he concluded that Creel did not fall within this group since there was no evidence in her file to support an inability to work.

On 25 July 2006, Liberty Mutual sent Creel a letter notifying her that her appeal had been denied and that she could ask Wachovia's Benefits Committee to review the decision.  In the letter, Liberty Mutual quoted extensively from Dr. Kurt's and Dr. Rim's reviews, including their conclusions regarding a lack of any neurological impairment or physical cause for her cognitive problems.  It then found that, "[b]ased on the totality of information contained in Ms. Creel's file," it

---

[12] According to Dr. Rim, in this conversation, Dr. Martinez reiterated his belief that Creel had atypical migraine headaches but also agreed that anxiety, depression, and medication overuse could be contributing to the headaches.  Dr. Rim attempted to speak with Dr. Afield as well, but was unsuccessful in contacting him by telephone.

[13] Although Dr. Rim found no evidence that Creel had ever suffered a stroke or experienced partial seizures, he noted that the 15 July 2002 attack for which she was initially hospitalized might have been a transient ischemic attack (TIA), or mini-stroke.  There appeared to have been no further occurrences of TIAs, however.  Dr. Rim also discounted the possibility of a hemiplegic or complicated migraine since Creel had no family history for what is normally a very rare disorder.  Hemiplegia involves paralysis on one side of the body.

had no support for concluding that she either had a physical impairment that prevented her from performing any occupation for which she was qualified or a "continued physical disability." WAC0834. Since she already had received the maximum benefits permitted for mental illness-based disabilities under the Plan, she was ineligible to receive further LTD benefits.

Creel timely appealed this decision to Wachovia's Benefits Committee. As part of this appeal, she submitted a 7 September 2006 opinion from Dr. Martinez, which was based on his examination of Creel and her medical records.[14] In this document, Dr. Martinez reiterated his earlier diagnosis of atypical complex migraine syndrome.[15] He indicated that this condition would cause Creel to feel sharp pains on the right side of her head, to experience weakness on her left extremities, and to become partially paralyzed. The onset of these attacks would be unpredictable, and, when they occurred, she would be "totally incapacitated and in bed" for, on average, ten days a month, with each attack lasting anywhere from four hours to two days. WAC0814. This combination of problems, he asserted, made her "100% permanently, totally disabled, unable to work, function, or

---

[14] It appears that Dr. Martinez conducted a new physical examination of Creel in making this report, but it is unclear if his report utilized any other information he did not have when he wrote his 25 May 2006 opinion.

[15] His earlier opinion identified the condition as "atypical migraine syndrome," but there appears to be no difference between the two terms. WAC0896.

compete in a competitive job environment." WAC0817. Creel's appeal letter referenced these conclusions and noted that they contradicted the IPCs' findings regarding the lack of a neurological cause for her migraines and the unlikelihood of her experiencing hemiplegic migraines.

Wachovia's Benefits Committee sent Creel a letter notifying her that it was affirming the decision to deny further LTD benefits. The Committee referenced the Plan's mental illness limitation and disability definition as well as Dr. Rim's conclusion that there was no neurological basis for her impairment, though it did not address Dr. Martinez's new opinion nor the appeal letter. According to the Committee, Creel had submitted "[n]o new medical documentation . . . which would controvert the previous decisions" to deny benefits.[16] WAC0783. As a result, there was an "absence of documentation supporting a physical impairment that meets the definition of Disability or Disabled under the provisions of the plan," which meant the Committee had no basis upon which to reverse the earlier decisions to deny benefits. Id.

---

[16] Liberty Mutual apparently believed that the documents did not affect its earlier conclusion and that it was unnecessary to send them to an IPC for review. An appeals review consultant for Liberty Mutual noted in an email to Wachovia that Dr. Martinez's report was not based on any new neurological or physical findings but rather on Creel's self-reported complaints. Accordingly, the consultant thought that the information contained in that report was consistent with that already addressed in earlier IPC reviews.

13

In February 2007, Creel filed suit in the United States District Court for the Middle District of Florida seeking LTD benefits from Wachovia under the Plan. Wachovia moved for summary judgment, which the district court granted. See Creel v. Wachovia Corp., 543 F. Supp. 2d 1298 (M.D. Fla. 2008). The court evaluated Wachovia's decision under the six-step standard of review for ERISA benefit denials set forth in Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1137–38 (11th Cir. 2004). See id. at 1305–06. The court found that Wachovia's decision to terminate benefits was not de novo wrong in light of the facts of the case and the language of the Plan. See id. at 1306. In particular, the court focused on the "proof" standard in the Plan, which it viewed as requiring Creel to submit evidence in whatever form Wachovia deemed satisfactory and permitting Wachovia to require objective medical evidence. See id. at 1306–07. Under Williams, this finding was sufficient to uphold the denial of benefits, and the court therefore granted Wachovia's summary judgment motion.[17] See id. at 1305–06, 1309. Creel now appeals the district court's decision.

## II. DISCUSSION

[17] The court also noted that Wachovia's decision was reasonable given the language of the Plan and facts of the case and thus, under Williams, could be affirmed even if it was de novo wrong. See id. at 1309. In making this determination, the court reviewed the denial under a heightened arbitrary and capricious standard because Wachovia had operated under a conflict of interest. See id. According to the court, Wachovia met this heightened standard because the objective evidence requirement "benefits all of the participants of the Plan by ensuring that only legitimate claims are paid, thus maximizing assets available to pay legitimate claims." Id.

14

We review de novo a district court's grant of summary judgment and "apply the same legal standards that governed the district court's decision." Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1358 (11th Cir. 2008). As previously noted, the district court evaluated Wachovia's decision under the six-step rubric set forth in Williams. Since the district court rendered that decision, though, we have recognized that the Supreme Court's intervening decision in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. __, 128 S. Ct. 2343 (2008), implicitly overruled this rubric "to the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard." Doyle, 542 F.3d at 1360. Our previous guidelines were as follows:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is 'de novo wrong,' then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is 'de novo wrong' and he was vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

White v. Coca-Cola Co., 542 F.3d 848, 853–54 (11th Cir. 2008).  Glenn affects only the sixth step in this scheme by making the existence of a conflict of interest a factor in the ERISA analysis, rather than the impetus for applying a heightened arbitrary and capricious standard.[18]  See id. at 854.  Accordingly, if there is a conflict of interest, a court should treat it as a factor in considering whether an administrator's benefits decision was arbitrary and capricious.  See Doyle, 542 F.3d at 1360.  Additionally, the burden is on the plaintiff to show the existence of such a conflict, not on the defendant to disprove its influence.  See id.

Creel raises four issues on appeal.  First, she argues that the district court erred by permitting Wachovia to require objective medical evidence of her inherently subjective condition.  Second, she contends that the court improperly allowed Wachovia to interpret the admittedly ambiguous mental illness limitation against her, thereby violating the doctrine of contra proferentem.  Third, she asserts that the district court erred by deeming Wachovia to have given a full and fair review to the new medical evidence presented to the Benefits Committee.  Finally,

_____

[18] Of course, Glenn would also affect the wording of the third step because there would be a single level of arbitrary and capricious review and thus no need to term it a "more deferential" arbitrary and capricious standard.  This "arbitrary and capricious" review would look at whether the administrator abused his discretion, whereas "heightened arbitrary and capricious" review would have applied a level of scrutiny in between abuse of discretion and de novo review.  See Williams, 373 F.3d at 1137.

she argues that the district court improperly applied the heightened arbitrary and capricious standard of review. We will address these arguments in turn.

A. Objective Medical Evidence Requirement

Creel contends that the decision to deny her claim based on a lack of objective medical evidence for her disability was both wrong and unreasonable. She reads the Plan not as requiring claimants to produce particular forms of evidence but rather as permitting claims administrators to require certain kinds of evidence. Under her interpretation, the Plan leaves it up to the administrator to decide what evidence would be necessary to show a disability in light of the circumstances of the individual claim. Since her migraines are inherently subjective, she argues it was inappropriate for Wachovia to require objective medical evidence of them. Further, she notes that she actually produced objective evidence regarding her claim, i.e., the various office notes, APSs and opinions from her physicians acknowledging her condition and the degree to which it incapacitated her, even if no medical tests specifically rendered the diagnosis of migraines.[19]

Wachovia contends that the Plan's language should be read as mandating that a claimant produce objective medical evidence to make out a claim. Even if

_____

[19] She also deems it unreasonable to discount her headache diary as objective evidence when the claims administrator, like the doctors, requested that she provide the diary.

the Plan contains no such requirement, however, Wachovia asserts that its decision to require such evidence is reasonable. A contrary interpretation, it argues, would render the disability claims review process effectively meaningless by always forcing administrators to accept claimants' subjective descriptions of their ailments regardless of the amount of evidence supporting them. Such a situation would inhibit the administrator's ability to fulfill its fiduciary duty to compensate only those who have legitimate disability claims.

Our prior cases provide guidance for assessing the reasonableness of benefits denials for disabilities that involve some subjective element, such as migraines, fibromyalgia, and chronic pain syndrome. When a plan requires claimants to provide objective medical evidence, an administrator's decision to deny benefits for failure to produce such evidence is reasonable, even though such evidence might be impossible to obtain for that condition. See Doyle, 542 F.3d at 1358 (deeming the denial of benefits reasonable for a claimant suffering from fibromyalgia who failed to put forth the objective evidence explicitly required in the plan). When the plan has no such requirement, however, we evaluate the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions. Assuming that the claimant has put forward ample subjective evidence, we look at what efforts the

18

administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent physician evaluations it conducted. Accordingly, an administrator's decision to deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review. See Oliver v. Coca-Cola Co., 497 F.3d 1181, 1196–97 (11th Cir. 2007), vacated in part on other grounds, 506 F.3d 1316 (11th Cir. 2007) (finding it arbitrary and capricious to deny benefits for fibromyalgia and chronic pain syndrome when claim was supported by ample evidence and administrator never requested any particular kind of evidence).

Considering Creel's case in light of our past case law, we find Wachovia's decision to deny her claim based on a lack of objective medical evidence both wrong and unreasonable. We agree with Creel that the Plan does not mandate that claimants produce any specific kind of such evidence to establish a successful disability claim. Instead, it provides a disjunctive list of various types of evidence that the administrator may require a claimant to produce, and includes among these the catch-all category of "other forms of objective medical evidence." As Creel notes, this distinction is important, since it vests the administrator with discretion

19

to determine what forms of evidence would be appropriate for analyzing a particular disability claim. However, this discretion would be limited to evaluating whether the claimant provided whatever evidence the administrator deems "may be required" for that particular disability. Accordingly, depending on the evidence provided by the claimant, an administrator's decision to deny a benefits claim based on a lack of objective evidence without ever identifying what objective evidence the claimant failed to produce could be unreasonable.

In this case, we find that Creel produced enough subjective and objective evidence to support her claim of a disability. She provided chart notes, standard diagnoses, and lab reports from multiple physicians discussing her condition and identifying it as physically-based, all of which are valid forms of objective proof under the Plan and can serve as the basis for a diagnosis of migraines.[20] These documents, particularly those from Drs. Afield and Martinez, indicate that she was suffering from debilitating headaches, which had a neurological basis. In addition, she provided her headache diary, which was the sole additional evidence requested

---

[20] Neither party has identified any objective tests that would automatically establish the existence of neurologically-based migraines, and there appears to be no set standard for establishing the existence of migraines. See Thompson v. Barnhart, 493 F. Supp. 2d 1206, 1215 (S.D. Ala. 2007) (noting that "neither the SSA nor the federal courts require that an impairment, including migraines, be proven through objective clinical findings"); Ortega v. Chater, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996) (finding that, because "present-day laboratory tests cannot prove the existence of migraine headaches," objective clinical evidence of the symptoms of migraines can suffice as proof).

by the claims administrator.[21]  This diary both corroborated the diagnosis of migraines and chronicled the degree to which they incapacitated her at regular albeit unpredictable, intervals.

Against this evidentiary backdrop, we find that Wachovia took insufficient action to justify the denial of benefits.  Creel complied with its request for the headache diary.  It identified no other forms of objective evidence which it would deem necessary for establishing the existence of a physically-based migraine.  Additionally, though Creel's file had been reviewed by three IPCs, it never requested an IME to test the veracity of her complaints, even though the Plan permitted it to do so.  Given that at least two of the IPCs, Drs. Kurt and Parcells, recognized that the evidence showed that she was suffering from headaches that were subjectively incapacitating, such an action would have been warranted.  An IME might have provided a better foundation for analyzing her claim than the paper-based IPC reviews.  Wachovia failed to make such a request and instead imposed an unreasonable objective evidence requirement.  It is unreasonable for the claims administrator to deny the claim for a lack of objective medical evidence

---

[21] Though the diary incorporates subjective observations, we find it to be "objective proof" since it is a form of evidence commonly used by physicians treating potential migraine patients, similar to how other doctors utilize x-rays or test results.  It is also objective in that it comes in a form that can be easily reviewed by claims administrators, as opposed to non-tangible, subjective evidence, such as pain tests for fibromyalgia.

when the claimant has provided ample subjective evidence of a disability and the administrator neither identified any objective evidence that the claimant could have supplied to support the claim nor had the claimant undergo an IME or a similar in-person probative procedure to test the validity of her complaints.[22] See Oliver, 497 F.3d at 1196–97. The decision to deny benefits based on a lack of objective evidence thus constituted an abuse of discretion.

Even though we conclude that the administrator's denial based on a lack of objective evidence constituted an abuse of discretion, there is insufficient evidence in the record for us to determine whether Creel's migraines prevented her from performing the tasks involved in any line of work. The district court concluded that Creel failed to provide objective evidence that she could not fulfill these duties. Even for subjective conditions like migraines, it is reasonable to expect objective medical evidence of an inability to work. See Boardman v. Prudential Ins. Co. of Amer., 337 F.3d 9, 16 n.5 (1st Cir. 2003) (noting that although the diagnoses of subjective conditions like "chronic fatigue syndrome and

---

[22] This conclusion should also not be read to require claims administrators to give deference to the opinions of a claimant's treating physicians over those of an IPC. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003) (noting that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician"). However, the decision not to accord special weight to the views of the claimant's physician must be based on "reliable evidence," which would involve something more than a paper-based peer review for disabilities involving subjective proof. See id. (holding that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation").

fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis"). However, as with the existence of the disability itself, the claims administrator appears not to have identified what objective evidence Creel could have used to show this inability to work.[23] Since Dr. Martinez declared that she was completely unable to work and Dr. Rim noted that migraines would generally be incapacitating, there could be an objective evidentiary basis for so finding, but we make no conclusions either way. Instead, we remand this case to the district court to address the issue by examining the extent to which Creel is limited by her headaches.[24]

B. Remaining Issues

Creel asserts that the mental illness limitation was ambiguous, and therefore Wachovia should not be allowed to interpret it so as to exclude her claim. We need not address this argument now because whether Wachovia's interpretation of the provision was wrong and unreasonable can only be decided once the district

---

[23] Wachovia alludes to a home business that Creel may have started, which it asserts is an occupation in which she could be employed even with irregular headaches. We do not have enough information to address this issue, but the district court may investigate it on remand. During the appeals process, Liberty Mutual did request that Creel provide records regarding a business for which Creel was a registered agent. However, it did so in order to determine whether she would be subject to an offset of any LTD benefits she received.

[24] As part of this analysis, the court could order, or conduct on its own, an investigation similar to the functional capacity examination used in Social Security benefits disputes.

court addresses on remand Wachovia's findings regarding Creel's ability to work. We also need not consider whether Creel received a full and fair review because that issue can only be decided after the district court applies our findings about the objective evidence requirement. The district court should reconsider these two issues in light of our findings about the objective evidence requirement.

## III. CONCLUSION

Creel appeals the district court's grant of summary judgment in favor of Wachovia regarding its denial of her claim for LTD benefits. We find that the district court erred in concluding that Wachovia's plan permitted it to require Creel to produce objective evidence of her migraines. Accordingly, we VACATE the summary judgment and REMAND for further proceedings consistent with this opinion.

**VACATED AND REMANDED**