[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12184
Non-Argument Calendar
_____

D.C. Docket No. 8:12-cv-00908-VMC-TGW


JOHN S. OATES,

Plaintiff-Appellant,

versus

WALGREEN COMPANY,
a foreign profit corporation,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 13, 2014)

Before TJOFLAT, JORDAN and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff John S. Oates appeals from the entry of final judgment against him in a suit to recover benefits allegedly due to him under the terms of the Walgreen Income Protection Plan for Pharmacists and Registered Nurses ("the Plan"). "We review de novo a district court's ruling affirming or reversing a plan administrator's ERISA benefits decision, applying the same legal standards that governed the district court's decision." Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011) (per curiam).

## I.    BACKGROUND

### A.    Relevant Plan Terms

The Summary Plan Description ("SPD") states that it "is the official Income Protection Plan governing document for purposes of describing the various plan provisions."[1]  According to the SPD, defendant Walgreen Company ("Walgreens") is the designated Plan Administrator, benefits are paid from Walgreens assets, and Walgreens is directly responsible for the final adjudication of disability claims. According to the SPD, a third party called Sedgwick CMS ("Sedgwick") is the Claim Administrator who handles initial claims determinations and appeals.

According to the SPD, both Walgreens and Sedgwick have authority to "construe and interpret the Plan and make benefit determinations, including claims

---

[1]    For the first time on appeal, Oates argues that the Summary Plan Description does not accurately describe the terms of the Plan. We decline to consider this argument made for the first time on appeal.  See infra Part II.

2

and appeals determinations." That authority is exercisable "as [Walgreens and Sedgwick] deem appropriate in their sole discretion." According to the SPD, Sedgwick's benefit determinations are binding on all parties, "except to the limited extent to which [Sedgwick's] decisions are subject to further review by [Walgreens]." The SPD provides for further review by Walgreens if either Walgreens or Sedgwick "determines that the appeal presents material issues that are outside the expertise or purview of [Sedgwick] (such as hours worked, employment status or new or unique procedural or Plan interpretation issues)."

Below, Walgreens submitted a sworn declaration from a Sedgwick employee stating that, based on the declarant's personal knowledge and her review of Sedgwick's business records, "[u]nder the Plan, Sedgwick performs claims evaluations and makes determinations on specific claims . . . . Walgreens only provides information regarding the general eligibility for Plan benefits and regarding the duties and compensation of Walgreens employees participating in the Plan."

Under the terms of the Plan, participants are required both to apply for Social Security disability benefits and also to appeal any denial of those benefits. If awarded, the Social Security disability benefits reduce the amount of benefits awarded under the Plan.

### B. Sedgwick's Determination That Oates Was No Longer Entitled to Long-Term Disability Benefits

3

As relevant on appeal, Sedgwick terminated Oates's long-term disability benefits claim effective May 22, 2011. Oates twice appealed to Sedgwick, but both times Sedgwick upheld the termination.[2] Walgreens was not involved with either the initial benefits determination or the appeals, and Oates never sought review by Walgreens.

Under the terms of the Plan, Oates was eligible for continued long-term disability benefits if, inter alia, as a "direct result" of sickness or accidental injury he was "unable to earn more than 60% of [his] indexed pre-disability earnings from any employer in [his] local economy at any gainful occupation for which [he was] reasonably qualified, taking into account [his] training, education, experience, and pre-disability earnings." Sedgwick maintains that Oates did not satisfy this criterion because he was able to work full-time in a sedentary capacity.

On appeal, Oates argues that Sedgwick failed to give due weight to evidence that he suffers from cognitive problems as a result of his medications, has problems with his hands, and is unable to sit for long periods of time. See infra Part IV. Oates also argues that Sedgwick failed to give due weight to the Social Security Administration's ("SSA's") determination that Oates was entitled to

---

[2]    Sedgwick first upheld the termination by letter dated October 11, 2011. Sedgwick upheld the termination a second time by letter dated February 21, 2012.

4

Social Security disability benefits.  See infra Part V.  We summarize a subset of the evidence relevant to Oates's contentions on appeal.

### 1.    Dr. Sweeney (Oates's Treating Physician)

Oates's treating physician, Dr. Sweeney, opined that Oates had been permanently and totally disabled since May 2009 and was unable to work safely in any capacity.  Oates submitted letters from Dr. Sweeney, addressed "to whom it may concern," and records of multiple office visits between January 2010 and November 2011.  These documents indicate that Oates regularly took multiple medications for chronic pain, anxiety, and depression.  In these documents, Dr. Sweeney opined that Oates exhibited "[c]ognitive dysfunction secondary to medication" and was restricted to "no critical thinking due to side effects of medications."[3]

Dr. Sweeney's letters and records also indicate that Oates had some hand trouble.  For example, Dr. Sweeney described a "trigger finger phenomenon" in Oates's right thumb.  Elsewhere, Dr. Sweeney stated that Oates "cannot do repetitive hand motion due to severe spasm and pain of his hands as well."  In another record, Dr. Sweeney reported that both of Oates's hands had erythema,[4]

---

[3]    Elsewhere, Dr. Sweeney described Oates as "[a]lert and oriented" during one particular office visit.

[4]    Erythema is "[r]edness due to capillary dilation."  Stedman's Medical Dictionary (27th ed. 2000).

that Oates experienced moderate pain in his right hand with motion, and that

Oates's left hand had a moderately reduced range of motion.[5]

### 2.    Dr. Puentes (Oates's Treating Chiropractor)

In a letter dated November 18, 2011, addressed "[t]o whom it may concern,"

Oates's treating chiropractor, Dr. Puentes, reported the following.

> This office continues to see the above-mentioned patient for his severe osteoarthritic, [sic] and degenerative conditions of the spine, neurogenic claudication of the lower extremities, chronic limitations and swelling of the knees, hands, and feet.
>
> Mr. Oates is unable to perform any type of repetitive movements, long periods of standing, sitting, or lifting due to the patients [sic] permanent disability.  The patients [sic] mental capacity is also severely limited due to the side effects of his medication.  The patient becomes very lethargic, forgetful, and unable to perform the most basic procedures without modification.
>
> The patient is [sic] and never will be able to perform his chosen profession or any other type of employment in a safe capacity for himself as well as for the public safety.
>
> [Oates's] physical condition will continue to worsen with time.  He has been permanently and totally disabled since 2009.

The record also contains notes from two of Oates's visits to Dr. Puentes's office

in May 2010.

### 3.    Dr. Kutner (the SSA's Independent Medical Evaluator)

---

[5]    Dr. Sweeney's records also state that Oates reported drinking beer daily, in the amount of a few beers per episode.

As required under the terms of the Plan, Oates applied for Social Security disability benefits. Oates was ultimately awarded monthly Social Security disability benefits beginning in November 2009. Oates was notified of this award by a Notice of Award letter dated March 7, 2011. Oates provided the Notice of Award letter to Sedgwick.

As part of his application for Social Security disability benefits, Oates was required to visit an independent medical evaluator named Dr. Kutner. In a report dated January 28, 2011, Dr. Kutner concluded that Oates "would not be able to do any type of work that requires him to be on his feet for long periods, no frequent bending, stooping or climbing."[6] Dr. Kutner offered no opinion about Oates's capacity to perform sedentary work or work involving light physical exertion. Dr. Kutner indicated that Oates's chief complaint was "pain in knees, back pains and difficulty standing up" and that Oates reported "difficulty doing any activities of daily living." Dr. Kutner also observed that Oates had driven to the clinic alone and was "alert, oriented pleasant and cooperative," although he "appeare[d] to be somewhat depressed over his situation." Dr. Kutner observed "no evidence of any

---

[6]    The record indicates that Sedgwick requested a copy of Dr. Kutner's report before terminating Oates's benefits, but Oates failed to provide a copy. Oates later mailed a copy to Sedgwick during his first appeal. The record indicates that Sedgwick provided a copy of Dr. Kutner's report to every independent physician adviser who reviewed Oates's file during Oates's first and second appeals. See infra Part I.B.4.

arthritis in any of [Oates's] extremities" and that the range of motion in Oates's hands was "within normal limits with no limitations."

### 4.    Sedgwick's Seven Independent Physician Advisers

At various points in the process, Sedgwick had Oates's file reviewed by multiple independent physician advisers.  None of these physicians observed Oates directly, but some communicated directly with Oates's treating physicians.  Each independent physician adviser stated in his or her report that he or she was not operating under a conflict of interest.[7]

In a report dated November 13, 2009, an orthopedic surgeon named Dr. Mendelssohn concluded that, based on then-existing medical documentation, Oates "can certainly function in a sedentary-to-light physical exertion level provided he can change positions as needed and does not have to climb ladders, stand for an extended period of time, or walk long distances."  As part of his review, Dr. Mendelssohn spoke with Dr. Sweeney by telephone.  In his report, Dr. Mendelssohn rejected Dr. Sweeney's opinion that Oates "cannot return to any gainful employment because of pain and the need for medications which may affect his cognitive ability."  Dr. Mendelssohn asserted that "there is no documentation provided that [Oates's] cognitive ability has been hampered."

---

[7]    A Sedgwick employee also stated, in a sworn declaration submitted by Walgreens below, that "Walgreens has no role in the selection or retention of these reviewing medical personnel."

In a report dated November 13, 2009, a pain medicine specialist named Dr. J. Lewis concluded that, from a pain medicine perspective, the then-existing medical documentation did not support a conclusion that Oates was disabled from performing sedentary work.

In a report dated September 20, 2011, a specialist in physical medicine and rehabilitation named Dr. M. Lewis concluded that "[s]edentary type of work may be applicable in this situation." Dr. M. Lewis stated that Oates's primary diagnosis was severe knee arthritis, which limited "his ability to be able to stand or walk for prolonged periods of time." Dr. M. Lewis found no evidence, however, that Oates was "disabled from any occupation for which he might be qualified by education, training, or experience during the time period in question." He specifically documented, inter alia, his review of Dr. Kutner's assessment for the SSA, as well as several failed attempts to reach Dr. Kutner. Dr. M. Lewis also documented his review of Dr. Sweeney's statements regarding Oates's purported cognitive dysfunction and hand problems, although he did not directly address these statements in his analysis.

In a report dated September 20, 2011, a specialist in occupational medicine named Dr. Ayyar concluded that Oates

> would not be able to perform prolonged standing and walking and heavy lifting, kneeling, stooping, squatting, etc. He can, however, do sedentary work. There is no compelling evidence that Mr. Oates is disabled from any occupation for which he might be qualified by

9

education, training, or experience . . . [from May 22, 2011,] through present.

Dr. Ayyar recounted a conversation with Dr. Sweeney in which Dr. Sweeney stated that Oates's principal diagnosis supporting disability was "bilateral knee osteoarthritis" but that, in Dr. Sweeney's mind, Oates was "disabled from any number of conditions." Dr. Ayyar also specifically documented, inter alia, a review of Dr. Kutner's report for the SSA, as well as several failed attempts to reach Dr. Kutner. Dr. Ayyar specifically documented a review of Dr. Sweeney's statements regarding Oates's purported hand problems and cognitive dysfunction, although Dr. Ayyar did not address these statements in his analysis.

In a report dated February 7, 2012, a psychiatrist named Dr. Rigaud concluded that, from a strictly psychiatric perspective, Oates "was not disabled from the ability to perform any occupation for which he may be qualified by education, training or experience as of May 22, 2011[,] to return to work date." Dr. Rigaud stated that there was "no evidence from the available information to support a disabling psychiatric diagnoses [sic]" and that "[r]eported cognitive dysfunctions/limitations and inability to engage in critical thinking are not validated by findings of a mini mental status examination or direct clinical observations." Dr. Rigaud documented a phone conversation with Dr. Puentes, who

10

reported observing [that Oates] was lethargic and in [Oates's] own words "loopy" at times. [Dr. Puentes] believes this is due to pain medications and not to alcohol or other illicit substances.[8] . . . Dr. Puentes stated that [Oates] has no problem driving to the office—that is a short distance from his home. He noted that [Oates] has difficulty with his gait and his speech is a "little slurred." Dr. Puentes has not observed evidence of problems with concentration such as loss of train of thoughts. Dr. Puentes has not had to write down instructions for [Oates]; who seems to retain instructions and directions he received from Dr Puentes. [Dr. Puentes] emphasized primarily [Oates's] physical limitations.

Dr. Rigaud did not specifically address Dr. Kutner's report for the SSA.

In a report dated February 7, 2012, a specialist in physical medicine and rehabilitation and pain medicine named Dr. Kaplan concluded, after a thorough review of the records before him, that they "[did] not validate that this claimant is disabled from performing any occupation for which he may be qualified from May 22, 2011[,] to return to work date." [9] According to Dr. Kaplan, Oates had a "partial impairment, but is not disabled from all work." Dr. Kaplan opined that "the records contain very limited objective functional assessment of [Oates's] physical

---

[8]    Dr. Rigaud had before her a Vocational Evaluation Report created by one Ms. Pennachio, see infra Part I.B.6, which indicates that Oates reported drinking eight to ten beers per day. Dr. Rigaud specifically referred to this statement in her report.

[9]    At the time of his review, Dr. Kaplan had before him the Vocational Evaluation Report created by Ms. Pennachio, see infra Part I.B.6. Dr. Kaplan discounted the Vocational Evaluation Report to the extent that Ms. Pennachio relied on subjective reports of Oates's abilities that were not based on physical examination or functional assessment data. For the first time on appeal, Oates argues that it was improper to discount Ms. Pennachio's findings on the basis that she relied on Oates's self-reports. See Oliver v. Coca Cola Co., 497 F.3d 1181, 1196 (11th Cir.), vacated in part on other grounds, 506 F.3d 1316 (11th Cir. 2007). We decline to consider this argument raised for the first time on appeal.

11

ability." Dr. Kaplan also noted that "cognitive deficits from medications are potentially treatable" and that "the records are unclear regarding the specific cause of [Oates's] perceived cognitive symptoms." He recounted conversations with Dr. Sweeney and Dr. Puentes in which both reported that Oates often "appears drowsy"[10] and in which Dr. Sweeney reported that Oates had severe intractable pain in his, inter alia, hands. Dr. Kaplan referred to Oates's Social Security disability benefits award but did not specifically address it in his analysis.

In a report dated February 7, 2012, a specialist in physical medicine and rehabilitation and pain medicine named Dr. Marion concluded that Oates was "able to work full time at the sedentary job level." Dr. Marion recounted a conversation with Dr. Sweeney in which the latter acknowledged that "he had not specifically performed a cognitive evaluation or assessment and had not restricted [Oates] from driving a motor vehicle." In that conversation, Dr. Sweeney also indicated that Oates had complaints of severe pain in his, inter alia, hands. Dr. Marion specifically documented his review of Dr. Kutner's report for the SSA.

### 5.    Mr. Percic's (Sedgwick's) Transferable Skills Analysis

At Sedgwick's request, a Mr. Percic completed an analysis of Oates's "transferable skills." Mr. Percic's report is dated May 20, 2011. According to his report, Mr. Percic reviewed, inter alia, the reports of Dr. J. Lewis and Dr.

---

[10]    According to Dr. Kaplan, it appeared from the medical records that Oates had "the diagnosis of sleep apnea as well as chronic pain."

Mendelssohn, as well as a letter from Dr. Sweeney dated January 25, 2011, and a note from Oates's visit to Dr. Sweeney's office on January 20, 2011.  Mr. Percic also reviewed a Training, Education, and Experience statement submitted by Oates, which indicated, for example, that Oates had worked for over twenty years as a pharmacist and had a Bachelor of Science degree in Pharmacy.

Based on Dr. Mendelssohn's report, Mr. Percic discounted Dr. Sweeney's assertion that Oates was restricted to "no critical thinking due to side effects of medications."  Mr. Percic also asserted that there was "no additional medical to support the statement of Dr. Sweeney that Mr. Oates is unable to perform repetitive hand motions due to severe spasm and pain of his hands."  Mr. Percic consequently assumed, for the sake of his analysis, that Oates was able to work in a "sedentary or light physical exertion level occupation in which he is able to change positions as needed and not require [sic] long distance walking, standing for extended periods of time, climbing stairs or ladders, or bending, stooping, and kneeling."

Mr. Percic also concluded—apparently based on Oates's reports of his own training, education, and experience—that Oates had demonstrated transferable skills including, but not limited to, "knowledge of drugs and drug interactions, basic medical knowledge, customer service skills, good communication skills, supervisory skills, management skills, good arithmetic skills, organizational ability, computer skills, typing skills, and good judgment and decision-making

13

skills." Using the SkillTRAN online computer database, Mr. Percic identified several vocational alternatives for Oates in his geographic area with a mean annual wage of $113,844.80—substantially more than 60% ($67,392.00) of Oates's pre-disability annual earnings, which was the threshold established by the applicable Plan eligibility standard. See supra.

### 6.    Ms. Pennachio's (Oates's) Transferable Skills Analysis

As part of his second appeal, Oates submitted his own Vocational Evaluation report dated December 12, 2011, which was prepared by one Ms. Pennachio. The report contains a lengthy review of Oates's medical records. According to the report, Ms. Pennachio met with Oates on November 18, 2011, and recorded his own description of his "perceptions of his physical capabilities," including that he could sit for only "1 hour, but . . . must sit forward for comfort." The report contains a transferable skills analysis that was conducted using OASYS software, "taking into account at least sedentary restrictions." The analysis produced zero vocational alternatives, let alone any in which Oates could earn at least 60% of his pre-disability earnings. It is not entirely clear why Ms. Pennachio's analysis yielded zero vocational alternatives while Mr. Percic's yielded several, but it appears that Ms. Pennachio believed Oates had fewer transferable skills. In her report, Ms. Pennachio specifically challenged each of Mr. Percic's proposed vocational alternatives on the ground that Oates was either

14

underqualified, disabled, or both.  Ms. Pennachio concluded that Oates "does not have the ability to perform any occupation for which he may be qualified by education, training or experience within his physical capabilities."

### C.    The Instant Lawsuit

Oates filed suit against Walgreens in federal district court, attaching the SPD as an exhibit to his complaint.  In a motion to, inter alia, limit discovery to the existing administrative record, Walgreens made three relevant assertions.  First, Walgreens expressed its belief that there was no dispute regarding which documents governed the Plan.  Second, Walgreens—arguing from the SPD— asserted that the Plan vested Sedgwick with sufficient discretion such that Sedgwick's benefits determinations should be reviewed under an "arbitrary and capricious" standard.  See, e.g., Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1355 (11th Cir. 2011) (per curiam).  Third, Walgreens asserted that there was no structural conflict of interest because the entity paying the claims, Walgreens, was not the same as the entity evaluating the claims, Sedgwick.

Oates apparently did not submit a written response to Walgreens's motion. At a subsequent hearing, however, Oates asserted that the SPD was merely a summary and that he "[did] not concede that that is the Plan."  Oates did not challenge Walgreens's assertion that the Plan vested Sedgwick with discretion. Oates argued that there was a conflict of interest, however, because Walgreens had

15

authority to be involved in benefits determinations and may have, at least, participated in the decision to terminate Oates's benefits. Oates sought to supplement the administrative record with discovery regarding both whether there was a conflict of interest and also how the claims benefits determinations were actually made.[11]

The district court held that there was no conflict of interest and that the administrator's determination would be reviewed under an "arbitrary and capricious" standard. The court permitted Oates to serve five interrogatories and five requests for admission, limited in scope to the following four issues:

> 1) the exact nature of the information considered by [Sedgwick] in making the decision; 2) whether Sedgwick was competent to evaluate the information in the administrative record; 3) how Sedgwick reached its decision; and 4) whether, given the nature of the information in the record, it was incumbent upon Sedgwick to seek outside assistance in addressing the claim.

Oates apparently never served any written discovery.

Pursuant to the district court's order, the parties submitted memoranda of law in support of their respective positions. The district court reviewed the termination of Oates's long-term disability benefits pursuant to this Circuit's six-step test, which is as follows.

---

[11]    Oates's attorney stated that he sought both discovery "because of the conflict" and also "Cerrito type discovery with regard to the actual claims decisions that were made." The word "Cerrito" is a reference to Cerrito v. Liberty Life Assurance Co. of Boston, 209 F.R.D. 663 (M.D. Fla. 2002).

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship, 644 F.3d at 1355.

The district court first concluded that Sedgwick's decision was not "wrong." The court alternatively concluded that, even if Sedgwick made the "wrong" decision, it was vested with sufficient discretion to invoke the "arbitrary and capricious" standard of review, and its decision was supported by "reasonable" grounds. Finally, the district court reiterated its conclusion that Sedgwick did not operate under a conflict of interest and opined that, even if it did, that factor was not so significant as to render the decision "arbitrary and capricious." The court

affirmed the termination of Oates's long-term disability benefits and ordered the entry of judgment in Walgreens's favor.  This appeal followed.

## II.    STANDARD OF REVIEW

For the first time on appeal, Oates challenges Walgreens's assertion that the Plan vested Sedgwick with sufficient discretion to invoke the "arbitrary and capricious" standard of review.  Oates makes this argument despite having asserted multiple times below that the Plan gave both Walgreens and Sedgwick discretion to make claims determinations.[12]

Oates also argues, for the first time on appeal, that it was improper for the district court to draw conclusions about Sedgwick's discretion under the Plan from the SPD because the SPD had not been authenticated or entered into evidence. Oates makes this argument despite having invited consideration of the SPD by attaching a copy of it as an exhibit to the complaint.

In addition, Oates argues that the district court's discovery order[13] prevented him from pursuing discovery that might have revealed "defects" in the SPD.[14] Oates did not argue below for additional discovery on that ground.

---

[12]    Oates made these assertions as part of his attempt to argue that Walgreens had participated in the decision to terminate Oates's benefits and that there was, therefore, a conflict of interest.

[13]    Walgreens observes that Oates did not mention the discovery order in his notice of appeal and argues that Oates consequently may not challenge it on appeal.  We disagree.  "[T]he appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment."  Barfield v. Brierton, 883 F.2d 923, 930 (11th Cir. 1989).  Because the district

18

We decline to consider these arguments raised for the first time on appeal. See Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1249–50 (11th Cir. 2012). We have reviewed Oates's arguments and are not persuaded that our refusal to consider them will result in a "miscarriage of justice." Id. at 1250. We consequently limit our review to the question of whether Sedgwick's determination was "arbitrary and capricious." Blankenship, 644 F.3d at 1355. Oates bore the burden to establish that it was. See id.

## III. WHETHER SEDGWICK OPERATED UNDER A CONFLICT OF INTEREST

If a plan administrator operates under a conflict of interest, that conflict is a factor to consider when determining whether the administrator's decision was arbitrary and capricious. Id. On appeal, Oates challenges the district court's conclusion that Sedgwick did not operate under a conflict of interest. Oates's primary argument is that Sedgwick has a financial incentive to deny claims. Oates

court's discovery order was a step toward the final judgment, rather than an order "separate from that progression," we have jurisdiction to review the discovery order on appeal. See 16A Charles Alan Wright et al., Federal Practice and Procedure § 3949.4, at 100–105 (4th ed. 2008) ("A notice of appeal that names the final judgment suffices to support review of all earlier orders that merge in the final judgment . . . , at least if the earlier orders are part of the progression that led up to the judgment rather than being separate from that progression.") (footnote omitted).

14    Oates relies heavily on Wilson v. Walgreen Income Protection Plan for Pharmacists and Registered Nurses, 942 F. Supp. 2d 1213, 1248–50 (M.D. Fla. 2013). The Wilson court conducted a bench trial on the issue of "whether the grant of discretion to Sedgwick under [the] Summary Plan Description . . . was effective to entitle Defendants to a review of Sedgwick's resolution of Plaintiff's [long-term disability] claim under a deferential standard of review." Id. at 1217. Obviously the evidence and testimony introduced in the Wilson bench trial was not before the district court in this case.

suggests that some unknown financial arrangement between Walgreens and Sedgwick may give Sedgwick a direct financial incentive to deny claims.[15] Oates also argues that Walgreens, as the payor, might prefer a claim administrator that denies more claims, resulting in indirect pressure on Sedgwick to deny claims so that it can keep its business with Walgreens.

Again, Oates failed to make these arguments below. Oates argued that the determination of his claim was tainted by a conflict of interest, but his argument was that the payor, Walgreens, had somehow participated in or influenced the decision. Oates did not argue, as he does now, that Sedgwick operated under a conflict of interest because it had a financial incentive to deny claims. Oates had the opportunity to make these arguments at the hearing on Walgreens's motion to, inter alia, limit discovery. In its motion, Walgreens had already argued that there was no conflict of interest, and it was clear that that question would be discussed at the hearing. Oates did not respond to Walgreens's motion in writing and did not

---

[15] Oates relies only on Wilson, 942 F. Supp. 2d at 1227, to support this proposition. As previously stated, supra note 14, the evidence and testimony before the Wilson court was not before the district court in this case. As Walgreens points out, furthermore, the Wilson court did not hold that Sedgwick operates under a conflict of interest when it acts as the Claim Administrator for this Plan. In addition, the Wilson court's discussion of the financial arrangement between Walgreens and Sedgwick does not uniformly support the proposition that Walgreens gives Sedgwick a direct financial incentive to deny claims. For example, the court in Wilson recounted testimony that "Sedgwick is paid monthly for every open claim. Further, if [a long-term disability] claim is granted, then the claim remains 'open' for purposes of calculating the fee collected by Sedgwick." Id. Therefore, even if we were to consider Wilson for the purpose of determining whether Walgreens gives Sedgwick a direct financial incentive to deny claims, it is not at all clear that Wilson supports Oates's argument.

make these arguments at the hearing. Nor did Oates make these arguments at any other point before the district court. We decline to entertain these arguments made for the first time on appeal.

To the extent that Oates reasserts a version of the argument that he did make below—i.e., that Walgreens had the authority to reverse Sedgwick's decisions and may have participated in the final decision to uphold the termination of Oates's benefits—that argument does not persuade us that there was reversible error. According to the SPD, Sedgwick's decisions are subject to further review by Walgreens only if either Sedgwick or Walgreens "determines that the appeal presents material issues that are outside the expertise or purview of [Sedgwick] (such as hours worked, employment status or new or unique procedural or Plan interpretation issues)." Even if the language regarding "new or unique . . . Plan interpretation issues" indicates that Walgreens has the power to reverse Sedgwick's Plan interpretations, it does not indicate that Walgreens has the power to reverse Sedgwick's factual determinations. More specifically, it does not indicate that Walgreens had the power to reverse Sedgwick's factual determinations with respect to Oates's condition and transferable skills. It is those determinations that Oates challenges on appeal. See infra Part IV.

Finally, to the extent, if any, that Walgreens's limited power of review created a conflict of interest, the district court did not err in its alternative holding

that the conflict was not significant enough to render Sedgwick's decision "arbitrary and capricious" in light of the other factors.  A conflict of interest should be weighed more heavily "where circumstances suggest a higher likelihood that it affected the benefits decision."  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117, 128 S. Ct. 2343, 2351 (2008).  The converse is also true.  There is no indication that the payor, Walgreens, directly influenced Sedgwick's determination.[16]  It is possible that the mere prospect of reversal influenced Sedgwick's decision, but the district court was not required to attach great weight to this possibility in the circumstances at bar.  We note, in particular, the sworn declaration of a Sedgwick employee that "[u]nder the Plan, Sedgwick performs claims evaluations and makes determinations on specific claims . . . .  Walgreens only provides information regarding the general eligibility for Plan benefits and regarding the duties and compensation of Walgreens employees participating in the Plan."

## IV.    WHETHER SEDGWICK IGNORED RELEVANT AND RELIABLE EVIDENCE THAT OATES'S MEDICATION CAUSED HIM COGNITIVE PROBLEMS, THAT OATES HAD PROBLEMS WITH HIS HANDS, AND THAT OATES WAS UNABLE TO SIT FOR LONG PERIODS OF TIME

Where there is no conflict of interest, an administrator's benefits decision is not "arbitrary and capricious" if it has a "reasonable basis" in the material available to the administrator at the time of the decision.  See Blankenship, 644 F.3d at 1354.

---

[16]    We note that Oates was permitted to serve written discovery on issues including "how Sedgwick reached its decision[s]," but Oates apparently declined to do so.

22

Oates correctly observes that only Mr. Percic's and Ms. Pennachio's transferable skills analyses applied the specific standard at issue in this case, i.e., whether as a "direct result" of Oates's sickness or accidental injury he was "unable to earn more than 60% of [his] indexed pre-disability earnings from any employer in [his] local economy at any gainful occupation for which [he was] reasonably qualified, taking into account [his] training, education, experience, and pre-disability earnings." Oates argues that it was arbitrary and capricious for Sedgwick to rely on Mr. Percic's May 2011 analysis because, inter alia, it did not incorporate more recent medical evidence.

We disagree. Sedgwick was not required to conclude that medical opinions obtained subsequent to Mr. Percic's analysis undermined the assumption on which it was based—i.e., the assumption that Oates was able to work in a "sedentary or light physical exertion level occupation in which he is able to change positions as needed and not require [sic] long distance walking, standing for extended periods of time, climbing stairs or ladders, or bending, stooping, and kneeling." We are likewise not persuaded that it was arbitrary and capricious for Sedgwick to favor Mr. Percic's transferable skills analysis over Ms. Pennachio's more recent analysis.

Oates argues that even if Mr. Percic's analysis was not out of date, it was nevertheless based on unreliable medical evidence. Specifically, Oates argues that Sedgwick's independent physician advisers—including Dr. Mendelssohn, upon

23

whom Mr. Percic relied—gave insufficient weight to evidence of Oates's cognitive dysfunction, hand problems, and difficulty sitting for extended periods of time. Oates argues that it was, therefore, arbitrary and capricious for Sedgwick to rely on a transferable skills analysis that relied on Dr. Mendelssohn's medical opinion.

Again, we disagree. A plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence," Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003), or "simply ignore[] relevant medical evidence in order to arrive at the conclusion it desire[s]," Oliver v. Coca Cola Co., 497 F.3d 1181, 1199 (11th Cir.), vacated in part on other grounds, 506 F.3d 1316 (11th Cir. 2007). A plan administrator is not categorically required, however, to accept the opinions of the claimant's treating physicians over those of independent medical professionals who have reviewed the claimant's file but have not directly observed the claimant. See Blankenship, 644 F.3d at 1356.[17]

Mr. Percic crucially relied on Dr. Mendelssohn's opinion. By the time Sedgwick upheld the termination of Oates's benefits for the second time, Sedgwick had before it the reports of six other independent physician advisers who had

---

[17]    In Black & Decker, the Supreme Court stated that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." 538 U.S. at 834, 123 S. Ct. at 1972. Black & Decker involved a conflict between the opinions of the claimant's treating physicians and an independent physician who had examined the claimant. See id. at 826–27, 123 S. Ct. at 1968. In Blankenship, however, we invoked Black & Decker in a case involving a conflict between the opinions of the claimant's treating physicians and independent physicians who had merely reviewed the claimant's file. See 644 F.3d at 1353, 1356.

reviewed Oates's file. These reports permitted Sedgwick to conclude that Dr. Mendelssohn's opinion was correct, at least in its crucial aspects. Specifically, three of these other physicians—specialists in pain medicine, occupational medicine, and physical medicine and rehabilitation—agreed that Oates was capable of performing sedentary work, and none of them disagreed. Two of these physicians—including a psychiatrist, Dr. Rigaud—agreed that evidence of Oates's cognitive problems was unpersuasive; two—again including Dr. Rigaud—suggested possible alternative explanations for Oates's purported cognitive dysfunction, such as alcohol consumption or sleep apnea; and one stated that any cognitive dysfunction resulting from Oates's medications was potentially treatable. In addition, four of these physicians specifically documented their consideration of Dr. Sweeney's statements that Oates suffered from hand problems (although apparently none of them addressed these statements in their written analyses).

In sum, Sedgwick had conflicting evidence before it, and evidence tending to establish that Oates was able to perform sedentary work was not obviously unreliable. We conclude that Sedgwick was permitted to deny Oates's benefits on the basis of this evidence. See Oliver, 497 F.3d at 1199 (stating that a plan administrator may deny a claim "on the basis of conflicting, reliable evidence").

## V.    WHETHER SEDGWICK FAILED TO GIVE PROPER CONSIDERATION TO THE SOCIAL SECURITY ADMINISTRATION'S DISABILITY DETERMINATION

Oates additionally argues that Sedgwick's determination was "arbitrary and capricious" because it failed to give sufficient weight to the SSA's determination that Oates was entitled to disability benefits. "'[A] district court may consider the Social Security Administration's determination of disability in reviewing a plan administrator's determination of benefits,'" but "the approval of disability benefits by the Social Security Administration is not considered dispositive on the issue." Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) (per curiam) (quoting Kirwan v. Marriott Corp., 10 F.3d 784, 790 n.32 (11th Cir.1994)).

We reject Oates's argument that the mere failure to consider the award of benefits rendered Sedgwick's determination "arbitrary and capricious." This is not a case in which Sedgwick "ignore[d] the evidence generated by the SSA process." Melech v. Life Ins. Co. of N. Am., 739 F.3d 663, 675 (11th Cir. 2014). In a letter memorializing the initial termination of Oates's benefits, Sedgwick asserted that it had previously requested a copy of the SSA's Independent Medical Examination and that Oates had failed to provide a copy.[18] Once Oates provided a copy of Dr. Kutner's report as part of his first appeal, Sedgwick provided it to each of the independent physician advisers who reviewed Oates's file during both his first and his second appeals. Multiple advisers specifically referred to Dr. Kutner's

---

[18]    Oates does not argue that Sedgwick had either the power or a duty to request a copy of this report directly from the Social Security Administration. Cf. Melech, 739 F.3d at 671.

26

findings, which were not obviously inconsistent with the conclusion that Oates was capable of working in a sedentary capacity.[19]  Accordingly, the instant case is very different from Melech, in which the plan administrator deemed irrelevant the SSA award and the evidence on which it was based.  Melech, 739 F.3d at 671–72.  The instant case does not involve the "procedural unfairness" which we found in Melech.  See id. at 676.

We cannot conclude that Sedgwick, having considered Dr. Kutner's report, was also required to specifically consider either the Social Security award itself or the contents of the Notice of Award letter.  The Notice of Award letter contained no information whatsoever about Oates's condition or the process by which the SSA had reached its decision.  Sedgwick's determination that Oates was not disabled is, of course, in some discord with the SSA's determination that he was, which was made under a perhaps more stringent standard.[20]  An administrator

---

[19]    Dr. Kutner's bottom line was that Oates "would not be able to do any type of work that requires him to be on his feet for long periods, no frequent bending, stooping or climbing."

[20]    According to Oates, the relevant definition of "disability" in the Social Security Act is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  For the purpose of that provision,

> an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or

27

departing from the SSA may be well-advised, whenever possible, "to draw a principled distinction between its own standards for granting disability benefits under [a plan] and the SSA's standards for awarding SSDI." Id. at 676. But having considered what is apparently the only substantive evidence generated by the SSA process,[21] and having found it not inconsistent with the opinions of its independent physician advisers, Sedgwick did not act arbitrarily and capriciously by failing to explain its departure from the SSA's opinion. See Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1452 n.5 (11th Cir. 1997) ("[A]n award of benefits by the Social Security Administration is not dispositive of the issue before us, particularly given the measure of deference that we afford a plan administrator's decision.").

We note that it may have been difficult for Sedgwick to explain its decision in light of the apparently limited evidence generated by the SSA process. We also note that the SSA, unlike ERISA claim administrators, is generally required to give more weight to the opinions of a claimant's treating physicians. See Black &

---

whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Id. § 1382c(a)(3)(B). Walgreens does not challenge Oates's assertion that the SSA's eligibility standard is more stringent than the Plan eligibility standard that is relevant on appeal.

[21]    Oates does not assert either that the SSA process generated additional substantive evidence or that Sedgwick was required to request additional information from the SSA.

28

Decker, 538 U.S. at 829, 123 S. Ct. at 1969.  Finally, we note that in both Melech and Glenn v. MetLife, on which Oates primarily relies, the entity paying the claims was the same as the entity evaluating the claims, which created a structural conflict of interest.  See Melech, 739 F.3d at 668 ("[E]very dollar the claimant gets from the SSA is one less dollar [the defendant] has to pay."); Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006) ("[Defendant] is authorized both to decide whether an employee is eligible for benefits and to pay those benefits."), aff'd, 554 U.S. 105, 112, 128 S. Ct. 2343, 2348 (2008).  As discussed, supra Part III, that was not the situation in this case.[22]

    **AFFIRMED.**

---

[22]    Other arguments not addressed in this opinion are rejected without need for further discussion.